752 F.2d 1554
 22 ERC 1001, 15 Envtl. L. Rep. 20,124
 WHITNEY BENEFITS, INC., and Peter Kiewit Sons' Company, Appellants,
v.
The UNITED STATES, Appellee.
 Appeal No. 84-919.
 United States Court of Appeals,
Federal Circuit.
 Jan. 9, 1985.
 
 George W. Miller, Hogan & Hartson, Washington, D.C., argued for appellants.
 David F. Grady, Hogan & Hartson, Washington, D.C., of counsel.
 Claire L. McGuire, Dept. of Justice, Washington, D.C., argued for appellee. With her on the brief were F. Henry Habicht, II, Asst. Atty. Gen., Alfred T. Ghiorzi and Dirk D. Snel, Washington, D.C.
 Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.
 NICHOLS, Senior Circuit Judge.
 
 
 1
 This case presents cross-appeals from an unreported decision of the Claims Court dismissing without prejudice a complaint seeking just compensation under the fifth amendment and 28 U.S.C. Sec. 1491. The view of that court, as stated from the bench, was that under the facts no taking could have occurred up to the date of hearing and it was then uncertain whether a taking ever would occur. We have jurisdiction under 28 U.S.C. Sec. 1295(a)(3). We hold that within the allegations of the complaint, appellants might establish facts constituting a taking. It is not a legal impossibility as the court below believed, though the instant record does not establish the matter one way or the other, without further fact investigation. Therefore, we reverse and remand.
 
 Alleged Facts
 
 2
 Appellant, Whitney Benefits, Inc., alleges it is a nonprofit corporation owning in fee certain coal-bearing property in Sheridan County, Wyoming. Appellant, Peter Kiewit Sons' Company, owns in fee part of the same property and is lessor of the entire mineral estate in the rest, by lease dated December 3, 1974, and still in effect by extension. The property is described by metes and bounds and is on an alluvial valley floor significant to farming. On August 3, 1977, Congress enacted the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. Sec. 1201 and ff, which by the theory of the complaint effects a legislative taking of the property involved. However, should any later event, up to the hearing, constitute the taking, appellants would amend to conform their theory of the action. They say the Act, expressly or in its "direct result," prohibited surface coal mining on land such as theirs. Desiring to mine, they applied for a license to the Wyoming Department of Environmental Quality, the state having enacted legislation conforming to standards it was required to meet in the federal act. The state denied the license, having no choice to do otherwise under its own or the federal law, according to the implicit theory of the complaint. According to representations by appellants to the court below in oral argument (but not substantiated by references to published legislative history) Congress was aware of this specific property and its problems, at one time considered, but in the end rejected, a "grandfather clause" to permit mining there, and could not but have intended mining of this property to be a target of the legislation. The mining would be conducted on the surface of the land, not underground. The plain meaning of the legislation is, and appellee United Staets does not seriously dispute, that there are special objections to coal mining on the surface of an alluvial valley floor and Sec. 1260(b)(5)(A) reflects a specially preclusive treatment of this kind of "strip mining." Licensing is flatly prohibited if it would interrupt or preclude farming of substantial extent or materially damage water quality, and if the valley is west of the 100th meridian of west longitude.
 
 
 3
 There is a "grandfather clause" for such mining actually going on in the period within a year before August 3, 1977. Further, for operators who have not actually begun, but have made "substantial financial and legal commitments" towards beginning, the Secretary is authorized to agree with such operators to convey the fee to, or lease in exchange, other federal land embodying coal deposits (but presumably not arable valley alluvial land). The Congress further says--
 
 
 4
 It is the policy of Congress that the Secretary shall develop and carry out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of this paragraph (5) in exchange for Federal coal which is not so precluded.
 
 30 U.S.C. Sec. 1260(b)(5)
 
 5
 The appellants, on denial of a license by Wyoming, according to counsel applied to the Secretary in 1979 for such an exchange but now, in 1984, negotiations are still under way with no agreement in sight. It is appellants' theory that this exchange provision has been rendered illusory, but they are willing to continue negotiating if assured that limitations will not run on their taking claim. Appellee says appellants have sued it under 30 U.S.C. Sec. 1270 in the United States District Court, District of Wyoming, to require the Secretary to effect an exchange.
 
 Statutes Applicable
 
 6
 The relevant parts of Sec. 1260(b)(5) are set forth hereinafter in an appendix, together with another portion of SMCRA which relates to judicial review, Sec. 1270, "Citizen's Suits." There is no reference to a Tucker Act suit, 28 U.S.C. Sec. 1491, in either provision.
 
 Position of Court Below and Appellee
 
 7
 The court below did not file an opinion, but decided the case from the bench. Its view can be quite simply stated. It is that the exchange mechanism described above is a procedure for ascertainment and payment of just compensation, and since facially under the statute just compensation is thus provided, appellants do not have a Tucker Act claim "under the Constitution." The fifth amendment is thus complied with facially, and a Tucker Act claim does not even start to accrue until the "exchange mechanism" has failed to accomplish its end as actually applied. To establish this, appellants must pursue an acceptable exchange for some unstated period of time and then, if they can, convince the district court in one of the modes of review provided within the four corners of the statute, that "just compensation" is being unconstitutionally delayed or denied. The appellee in the court below contended that in a suit under Sec. 1270 the court should grant a trial de novo as to the value of the property taken. Whether it would so contend in any other court is hard to say since Sec. 1270 embodies no such requirement expressly.
 
 
 8
 The court below rejected appellee's other arguments: first, that Claims Court jurisdiction is completely precluded in all possible eventualities, and second, that the "exhaustion doctrine" requires appellants to contest the denial of the license by all state review procedures, administrative and judicial, even though they accepted denial of a license to mine as the only possible result under the statutes, federal and state. While appellee cross-appealed, we do not understand it to be urging on us the points the Claims Court rejected.
 
 Discussion
 
 9
 The most obvious difficulty with the Claims Court's position, if we understand it correctly, is the fact that the "exchange mechanism" is nowhere stated in the statute or legislative history (so far as we have been able to delve into the latter) to be the exclusive method of ascertaining constitutional just compensation. The Supreme Court has recently reiterated that statutory supersession of the Tucker Act method is not lightly to be implied. Ruckelshaus v. Monsanto Company, --- U.S. ----, ----, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984) (following Regional Rail Reorganization Act Cases, 419 U.S. 102, 133, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974)). Here the statute nowhere says the appellants are obliged to accept exchange land as "just compensation." It is more logical, and more consistent with the statute, to say it is a possible mode of settling a money claim which the claimant may accept if so minded, thus reducing the cash outflow from the Treasury. It seems obvious Congress did not mean to force an exchange upon a claimant not so minded. In the first place, the entire statute, including this portion, having been enacted at a time of "energy crisis," was meant to maintain the production of coal as a vital source of energy so far as consistent with the paramount environmental concerns of the Act. To force an exchange on a claimant who wanted to get out of the coal business would be futile as he would dispose of the exchanged property for what it would realize.
 
 
 10
 We add that a cross-reference in Sec. 1260(b)(5) says that exchanges shall be made under 43 U.S.C. Sec. 1716. This latter provision was part of the Federal Land Policy and Management Act of 1976, Pub.L. No. 94-579, 90 Stat. 2756, and neither that Act nor its legislative history offer any suggestion that exchanges are authorized without the consent of the private party with whom the exchange is effected.
 
 
 11
 Finally, as to this question of interpretation, an attempt to force a person, otherwise identifiable as a former owner of property taken, to receive as just compensation other lands rather than money, would be of dubious constitutionality. This matter is discussed in Regional Rail Reorganization Act Cases, 419 U.S. 102, 150, 95 S.Ct. 335, 361, 42 L.Ed.2d 320 (1974), but resolved only in the context of the Court's holding that the statute there under review was an exercise of the bankruptcy power rather than one for the acquisition of property for public use. The modern view, as stated in that case, and in 3 P. Nichols, Eminent Domain Sec. 8.2 (3d ed.1984) is that statements that just compensation must always be in money are too sweeping. However, requirements that a condemnee accept the taker's bonds, or its surplus lands, remain pretty indefensible. Of federal cases there are cited, as to land, only Vanhorne's Lessee v. Dorrance, 2 Dall. 304, 1 L.Ed. 391 (C.C.D.Pa.1795), which is positive that the Constitution does not permit any such imposed substitution. This is a very old case and not of our highest court, but it is followed by a number of state cases, and has been cited by Nichols in all editions for the proposition stated. While we do not undertake to decide this constitutional issue, as we do not think it is presented by the statute we are to interpret and apply, it stands as a good reason to prefer an interpretation which does not confront us with any constitutional question.
 
 
 12
 Where the question is whether a regulation not meant to take an interest in land is so onerous as to effect a taking by imputation, and with no provision for money compensation, the availability of substitution rights may be important in determining whether the regulation is something the landowner can live with without unfairness. This is why substitution rights play the important part they do in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), a case much discussed by the parties herein. But the Court there is very clear also that Penn Central was not prevented from deriving profit from the involved real property, only limited in its further development. Evidently an option to substitute, as in Penn Central, placed the aggrieved landowner in a more favorable position, and therefore in a poorer one to complain of a breach of the just compensation clause. On the other hand, if we have here a requirement that the landowner accept a substitute, instead of money, he is in a worse position instead of a better one, particularly insofar as concerns his entitlement to "delay damages," also known as interest from the taking date. No such requirement was before the Court in Penn Central, supra.
 
 
 13
 There are certain legal situations where ours or any other sovereign government, exercising its proper power, can manage the property of citizens, transforming it by sale or exchange from one kind of property to another, without necessarily effecting a taking, at least as long as it is not acting in entire disregard of the owner's interests. One instance is bankruptcy, dealt with in Regional Rail Reorganization Cases, supra. A second is the property of dependent Indian tribes. See United States v. Sioux Indian Nation, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) and cases there cited. A third are the claims of United States citizens against foreign nations which have repudiated their debts or deny owing them, or given offense in some other manner. See Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). The government makes no contention that it is entitled to take over and manage the property of the appellants here on the above grounds, or any others of the same nature. Therefore, cases such as those cited in this paragraph have no bearing on the right of the government to impose a substitution here.
 
 
 14
 We hold, therefore, that the pursuit of a substitution or exchange transaction under Sec. 1260(b)(5) is not a mandatory remedy but is optional with the landowner, who retains also the option to sue in the Claims Court for money without such pursuit. The existence of the exchange option may have at times a bearing on whether or when a taking has occurred, but it is not a jurisdictional bar to merely filing the lawsuit, as the government and the Claims Court conceived. Since the option may perfectly well be exercised after the taking, as a means of settling the just compensation claim, it is not by its mere existence incompatible with a claim for a legislative taking, or a taking at any other later time.
 
 
 15
 We agree with the Claims Court judge that the exhaustion doctrine does not require appellants to do anything so absurd as to pursue to the bitter end, in state administrative tribunals and in courts, an attack on a state decision denying them a permit to mine, which decision they believe to have been correct.
 
 
 16
 The government seemed also to argue below that the "citizen's suit" remedy under Sec. 1270 was meant to be preclusive of the Claims Court remedy under 28 U.S.C. Sec. 1491. We gather the point is abandoned here, but as it is jurisdictional we consider it briefly. As the title "citizen's suit" implies, the object of writing the provision was to assure access to the courts by "private attorneys general" whose standing was as tenuous as the Supreme Court would permit. See H.R.Rep. No. 218, 95th Cong., 1st Sess. 90, reprinted in 1977 U.S.Code Cong. & Ad.News 593, 626. There is nothing to show that attention was focused on just compensation suits brought by targets of regulation, but in any event, the provision expressly states it is not preclusive of any remedies a person may have under any other law. The view of the Supreme Court as to the role of the Tucker Act suit as a safety net to assure compliance with just compensation requirements, as expressed in Ruckelshaus v. Monsanto, supra, and other cases cited therein, is entirely inconsistent with any reading of the citizen's suit provision, Sec. 1270, as carving anything out of the jurisdiction of the Claims Court as it otherwise would be.
 
 
 17
 Assuming then, contrary to the belief below, that there is no jurisdictional preclusion or other statutory bar, it would seem impossible to dismiss this suit for just compensation under the Tucker Act on motion, just on reading the complaint, without other evidence. It would reveal extraordinary ineptitude on the part of the complaint draftsman, ineptitude which counsel on neither side give any evidence of suffering from. The complaint alleges a legislative taking, effective to accrue the claim on the date of enactment of the statute, but if a taking occurred on any later date, the court would allow amendment, and the theory of dismissal was and could only be that it had not occurred at all and could not have.
 
 
 18
 The Supreme Court has repeatedly stated that it has been unable to develop any "set formula" to determine when "justice and fairness" require that "economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Ad hoc factual inquiries are necessary, and several factors are identified such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. Hodel v. Virginia Surface Mining & Reclamation Association, Inc., 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981) (quoting from Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)). Hodel is of special interest as it deals with the same SMCRA that we have before us, though it is important to note we deal with an entirely different portion of the Act than did the Court in that case. It dealt with surface mining in Virginia and West Virginia, while we consider provisions in Sec. 1260(b)(5) that deal solely and only with alluvial farm land located west of the 100th parallel. The important teaching of Hodel is that because of the ad hoc nature of the inquiry, a sweeping fifth amendment attack is not possible. The court must have specific tracts of land before it, and the aggrieved owners of these tracts must show they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow. It is in this kind of context that fifth amendment litigation is also held premature in such cases as Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).
 
 
 19
 A provision for just compensation is not the kind of escape hatch Hodel and Agins refer to and have in mind. The instant case differs in that we are not concerned only with regulation in which government acquisition is not contemplated and the private owners are expected or at least hoped to remain in charge. Here the language to be construed provides more than mere regulation. It specifically visualizes government acquisition of interests in land. We repeat the statutory words--
 
 
 20
 It is the policy of Congress that the Secretary shall develop and carry out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of this paragraph (5) in exchange for Federal coal which is not so precluded. [Emphasis supplied.]
 
 
 21
 When an interest in land is to be acquired and the only question is when title is to pass, the difficulty in discerning a taking is much reduced, as the Court of Claims held in Drakes Bay Land Co. v. United States, 424 F.2d 574, 584, 191 Ct.Cl. 389 (1970). It was explained that when the government singles out land for ultimate acquisition--
 
 
 22
 We think that the activities of officials can be found to be takings much more readily when there is no official question whether the land is to be acquired, only when, and the activities involved are all directed to that ultimate end. This is a hybrid situation, not the pure legislative taking, as in the Redwoods Act, and not the pure physical invasion of land apparently unwanted as Government property, as in Eyherabide [v. United States, 345 F.2d 565, 170 Ct.Cl. 598 (1965) ]. The Congress was well aware of the economic harm that would result to persons who intended subdivision and others, if the inchoate taking were left unperfected.
 
 
 23
 The court had previously expressed the view that some kind of inchoate interest inured to the government upon the passage of the Act, since it pointed to the Drakes Bay land as intended for ultimate acquisition. The court noted that justice would require that the value of the land should neither be enhanced nor diminished by the expectations rising out of the statute itself. It held, therefore, that the time when economic development was effectually prevented was the date of taking. It is to be noted that our present appellants allege that the passage of the SMCRA by itself effectually halted economic development of their land as coal land, without more being done on the government side. This could lead to selection of a taking date which is, in relation to the date of statutory enactment, earlier than the date selected in Drakes Bay.
 
 
 24
 Should there be any doubt that there are in this case fact issues requiring further development, if not trial, it is resolved by Skaw v. United States, 740 F.2d 932 (Fed.Cir.1984). That case deals with a mining claim alleged to have been subjected to a legislative taking by an amendment providing that dredge or placer mining was prohibited within a certain river bed. The panel of this court held, reversing the Claims Court, that this could constitute a legislative taking if the claimant could try on the shoe and it fit, i.e., if it could show its claim was within the river bed, and that it could not mine except by the prohibited method. This conclusion was much aided by the fact that, as also here, Congress recognized it might owe money to certain persons as a result of its legislation, and appropriations were authorized. Besides the Supreme Court authority also cited by us, the panel refers to Yuba Goldfields, Inc. v. United States, 723 F.2d 884 (Fed.Cir.1983), another holding by this court. It teaches that the frustration of mining operations can be a taking even though the government believes it is only protecting its legal rights, and also, that whether or not there has been a taking, even if not so intended, is normally a fact issue that cannot be resolved except on a "complete record," or a trial.
 
 Conclusion
 
 25
 We conclude that the decision and judgment of the Claims Court, to dismiss the complaint, was erroneous and must be reversed. The major premise, that pursuit of an exchange transaction must occur and be unsuccessful before a taking can occur, is a misconstruction of the governing statute. Actually the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act, 28 U.S.C. Sec. 1491. Under and within the allegations of the complaint, as it is or as it may be amended, complainants may be able to prove that the property identified in the complaint is coal deposits, or interests therein, as to which surface mining is effectively prohibited by 30 U.S.C. Sec. 1260(b)(5), and as to which, without prohibited surface mining, the realization of investment-backed expectations is precluded thereby. They may be able to prove that a constitutional taking has occurred as of the date of the legislation, August 3, 1977, or some subsequent date that has already occurred. The court is not precluded from suspending or staying the action if it believes that further pursuit of the exchange transaction before the Secretary or in court may result in a trial being unnecessary and thus in a conservation of judicial resources. Accordingly, the judgment of dismissal is reversed and the cause is remanded for the conduct of further proceedings consistent with this opinion.
 
 
 26
 REVERSED AND REMANDED.
 
 STATUTORY APPENDIX
 
 27
 (30 U.S.C.)
 
 Sec. 1260. Permit approval or denial
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 (b) Requirements for approval
 
 
 31
 No permit or revision application shall be approved unless the application affirmatively demonstrates and the regulatory authority finds in writing on the basis of the information set forth in the application or from information otherwise available which will be documented in the approval, and made available to the applicant, that--
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 (5) the proposed surface coal mining operation, if located west of the one hundredth meridian west longitude, would--
 
 
 35
 (A) not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production, or
 
 
 36
 (B) not materially damage the quantity or quality of water in surface or underground water systems that supply these valley floors in (A) of subsection (b)(5) of this section:
 
 
 37
 Provided, That this paragraph (5) shall not affect those surface coal mining operations which in the year preceding August 3, 1977 (I) produced coal in commercial quantities, and were located within or adjacent to alluvial valley floors (II) had obtained specific permit approval by the State regulatory authority to conduct surface coal mining operations within said alluvial valley floors.
 
 
 38
 With respect to such surface mining operations which would have been within the purview of the foregoing proviso but for the fact that no coal was so produced in commercial quantities and no such specific permit approval was received, the Secretary, if he determines that substantial financial and legal commitments were made by an operator prior to January 1, 1977, in connection with any such operation, is authorized, in accordance with such regulations as the Secretary may prescribe, to enter into an agreement with that operator pursuant to which the Secretary may, notwithstanding any other provision of law, lease other Federal coal deposits to such operator in exchange for the relinquishment by such operator of his Federal lease covering coal deposits involving such mining operations, or pursuant to section 1716 of title 43, convey to the fee holder of any such coal deposits involving such mining operations the fee title to other available Federal coal deposits in exchange for the fee title to such deposits so involving such mining operations. It is the policy of the Congress that the Secretary shall develop and carry out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of this paragraph (5) in exchange for Federal coal which is not so precluded. Such exchanges shall be made under section 1716 of title 43;
 
 
 39
 * * *
 
 
 40
 * * *
 
 Sec. 1270. Citizens Suits
 
 41
 (a) Civil action to compel compliance with this chapter
 
 
 42
 Except as provided in subsection (b) of this section, any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter--
 
 
 43
 (1) against the United States or any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution which is alleged to be in violation of the provisions of this chapter or of any rule, regulation, order or permit issued pursuant thereto, or against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter; or
 
 
 44
 (2) against the Secretary or the appropriate State regulatory authority to the extent permitted by the eleventh amendment to the Constitution where there is alleged a failure of the Secretary or the appropriate State regulatory authority to perform any act or duty under this chapter which is not discretionary with the Secretary or with the appropriate State regulatory authority.
 
 
 45
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties.
 
 
 46
 (b) Limitation on bringing of action
 
 
 47
 No action may be commenced--
 
 
 48
 (1) under subsection (a)(1) of this section--
 
 
 49
 (A) prior to sixty days after the plaintiff has given notice in writing of the violation (i) to the Secretary, (ii) to the State in which the violation occurs, and (iii) to any alleged violator; or
 
 
 50
 (B) if the Secretary or the State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the provisions of this chapter, or any rule, regulation, order, or permit issued pursuant to this chapter, but in any such action in a court of the United States any person may intervene as a matter of right; or
 
 
 51
 (2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice in writing of such action to the Secretary, in such manner as the Secretary shall by regulation prescribe, or to the appropriate State regulatory authority, except that such action may be brought immediately after such notification in the case where the violation or order complained of constitutes an imminent threat to the health or safety of the plaintiff or would immediately affect a legal interest of the plaintiff.
 
 
 52
 (c) Venue; intervention
 
 
 53
 (1) Any action respecting a violation of this chapter or the regulations thereunder may be brought only in the judicial district in which the surface coal mining operation complained of is located.
 
 
 54
 (2) In such action under this section, the Secretary, or the State regulatory authority, if not a party, may intervene as a matter of right.
 
 
 55
 (d) Costs; filing of bonds
 
 
 56
 The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.
 
 
 57
 (e) Effect on other enforcement methods
 
 
 58
 Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any of the provisions of this chapter and the regulations thereunder, or to seek any other relief (including relief against the Secretary or the appropriate State regulatory authority).
 
 
 59
 (f) Action for damages
 
 
 60
 Any person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district in which the surface coal mining operation complained of is located. Nothing in this subsection shall affect the rights established by or limits imposed under State Workmen's Compensation laws.
 
 
 61
 MARKEY, Chief Judge, dissenting.
 
 
 62
 I respectfully dissent, and would affirm dismissal of the complaint.
 
 
 63
 Neither enactment of 30 U.S.C. Sec. 1260(b)(5) nor Wyoming's subsequent permit denial constituted in my view an acquisition by the United States of an interest in coal belonging to Whitney Benefits or to Peter Kiewit Sons' Co. (Benefits). Section 1260(b)(5) forecloses only the surface mining, i.e. "strip mining", of coal under an alluvial valley floor west of the one hundreth meridian west. Benefits remains free under the statute to mine its coal by other, less environmentally damaging methods. In my view, Benefits' expectation of a permit to strip mine does not, in itself and without more, constitute "property" as envisaged in the Fifth Amendment.
 
 
 64
 A statute regulating the uses of property is reviewed on the basis of whether it denies an owner "economically viable use". Agins v. Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); see also Hodel v. Virginia Surface Mining & Recl. Assn., 452 U.S. 264, 295-96, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). Section 1260(b)(5), while prohibiting surface mining, conditionally provides for other methods of mining, thereby permitting "economically viable use". Thus, the prohibition of the statute is distinguishable from that involved in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), in which a state statute forbade any mining of coal that caused the subsidence of any house, thus rendering all means of mining commercially impracticable. Benefits has not alleged that denial of a permit to strip mine deprived it of all opportunity to mine its coal by other methods. Indeed, its complaint nowhere mentions any other method, but simply asserts that the mere passage of the statute constituted a taking on the date of its enactment.
 
 
 65
 Under Sec. 1260(b)(5), methods which do not "interrupt, discontinue, or preclude farming," 30 U.S.C. Sec. 1260(b)(5)(A), and which do not "materially damage the quantity or quality of water in surface or underground water systems," 30 U.S.C. Sec. 1260(b)(5)(B), are expressly excepted from the general prohibition. Thus, if Benefits selected a method meeting those requirements, the statute would not preclude its obtaining a permit. That an alternative permissible method might be less profitable is not determinative. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124-28, 98 S.Ct. 2646, 2659-61, 57 L.Ed.2d 631 (1978). If Benefits should decline to follow statute and regulation, it would be entitled to nothing. See generally 123 CONG.REC. 15,965-66 (May 20, 1977).
 
 
 66
 Though I would affirm the dismissal, I would not adopt the approach employed by the Claims Court. It held, in essence, that the time for a taking suit, if any, had not yet arrived. It employed a proposition appearing in Hodel, supra, 452 U.S. at 297 n. 40, 101 S.Ct. at 2371 n. 40, in which the Supreme Court said "an alleged taking is not unconstitutional unless just compensation is unavailable." Accepting Benefits' allegations as true for the purposes of the Government's motion to dismiss, the Claims Court held that availability of a fee coal exchange provision under Sec. 1260(b)(5) was material in considering whether "just compensation is unavailable," and thus in considering whether an unconstitutional taking had in fact occurred. See Penn Central, supra, 438 U.S. at 137, 98 S.Ct. at 2665. Thus, it concluded that the case was not ripe for adjudication because an available administrative remedy, which might potentially yield a dollar-for-dollar "recovery", had not been exhausted. See Hodel, supra, 452 U.S. at 297, 101 S.Ct. at 2371. In considering the Government's motion to dismiss, however, the Claims Court was required to accept only Benefits' fact allegations, not its legal assertions concerning what type of property interest may be judicially recognized as subject to an unconstitutional taking.
 
 
 67
 The basis for assertion of a taking claim appears in paragraph 9 of the complaint:
 
 
 68
 9. As a direct result of the passage of SMCRA [Sec. 1260(b)(5) ] and the prohibition of surface coal mining on alluvial valley floors significant to farming, plaintiffs have been deprived of the benefits of ownership and denied economically viable use of the property in question.
 
 
 69
 The foregoing allegation asserts that a denial of "economically viable use" occurred the moment Sec. 1260(b)(5) was passed. Because that statute forbade only surface mining, it is possible to assume, as the Claims Court was required to assume in considering the motion to dismiss, that Benefits was alleging that surface mining is an economically viable use of the property right in question. That the statute denies that use is clear in the wording of the statute itself. Nowhere, however, does the complaint allege that surface mining is the only economically viable use of the property right, or that other mining methods are impossible, impractical, or not economically viable. Indeed, counsel for plaintiff told the Claims Court: "With respect to this particular piece of property, if it can't be used to mine coal, it has no other economically viable use." (emphasis added). My difficulty with the complaint lies precisely here, that it fails to allege facts bringing Benefits within the purview of the statute, a statute that does not say the property in question "can't be used to mine coal."
 
 
 70
 Though all inferences must be drawn in favor of the complainant, it would not seem too much to ask that one relying on a statute that forbids one use and specifically permits others be required to allege facts applicable to the entire statute. In Skaw v. United States, 740 F.2d 932, 939 (Fed.Cir.1984), for example, summary judgment was reversed because the parties had submitted to the trial court three factual issues, one of which was whether plaintiff's mining claim could be mined by methods other than the placer or dredge mining prohibited by the statute involved in that case.
 
 
 71
 Because I consider Congress' removal of the freedom to strip mine as not in itself constituting a judicially cognizable taking, and because Benefits has not alleged facts indicating that strip mining is the only economically viable use, I would dismiss the complaint for failure to state a claim on which relief could be granted.
 
 
 72
 "[N]ot all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion." United States v. Willow River Power Co., 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945). That a taking will not lie under the allegations of this complaint is particularly appropriate where, as here, Congress has conclusively determined the "use" precluded by statute to be destructive of the public health and welfare. 30 U.S.C. Sec. 1201; see also Penn Central, supra, 438 U.S. at 130-31, 98 S.Ct. at 2662; Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).
 
 
 73
 Benefits stated before the Claims Court that it would be perfectly happy with a stay order, that it was currently conducting negotiations with the Secretary, and that it had filed its complaint in the Claims Court as a precaution (1) to forestall the effect of a statute of limitations that might run from an early date of any "taking" that might be found to have occurred, and (2) to "light a fire" under the Secretary. It has gained these objectives, and has now filed a "citizen's suit" in district court to compel exchange of its interests for federal coal. That is as Congress intended the process to work.
 
 
 74
 The present statute envisages neither condemnation nor land acquisition. That one denied the right to strip mine in a first location may choose to compel the Secretary to grant the right to mine at a second location, and that the Secretary shall receive in exchange the right to mine in the first location, does not constitute a land acquisition or a program designed to acquire mining rights. The exchange provision is consistent with the dual intent of Congress of promoting development of the nation's coal resources while simultaneously precluding injury to the environment resulting from strip mining. 30 U.S.C. Sec. 1202. The present exchange mechanism is thus one contributing to fairness, see 123 CONG.REC. 15,755 (May 20, 1977), and is not unlike the Transferable Development Rights involved in Penn Central, 438 U.S. at 137, 98 S.Ct. at 2665.
 
 
 75
 As above indicated, I would dismiss the complaint for failure to state a claim on which relief could be granted, with leave, of course, to amend, if Benefits is able, to assert facts indicating that it cannot economically mine its coal by any methods permitted in Sec. 1260.