**INNOVAIR AVIATION, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–408C.

United States Court of Federal Claims.

Aug. 22, 2008.

compel if a resolution is not reached. *See* J.
Status Report 1, Aug. 6, 2008.

Ty Cobb, Hogan & Hartson, Washington, D.C., with whom were H. Christopher Barto-lomucci and Audrey E. Moog, of counsel, for Plaintiff.

Sheryl Floyd, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were David Cohen and Peter Keisler, Asst. Att'y Gen., for Defendant.

## OPINION and ORDER

SMITH, Senior Judge.

As this case nears its end, the Court must determine what just compensation is due to Plaintiff for the taking of their property, specifically the Technology License Agreement (TLA).

## I. BACKGROUND

This case has had a long history through the Federal Courts. The facts are well described in this Court's liability opinion. *Innovair Aviation Ltd. v. United States,* 72 Fed.Cl. 415, 416 (2006).

Innovair filed its complaint in this Court on July 10, 1996, alleging that the Government had taken the TLA and not paid just compensation. This Court stayed this action in 1998 pending the outcome of the second appeal to the Ninth Circuit. Following the Ninth Circuit's opinion in 2002, this Court lifted the stay and denied the Government's motion to dismiss. After the stay was lifted, this Court, in "an abundance of caution" ordered the parties to address whether the Federal Circuit's decision in *Vereda v. United States,* 271 F.3d 1367 (Fed.Cir.2001) foreclosed this action. In *Vereda,* the Federal Circuit determined that the Court of Federal Claims lacks jurisdiction over a substantive challenge to a seizure under the Controlled Substances Act (CSA). This Court noted

that this case does not present that issue because the Ninth Circuit, the court with jurisdiction to review the merits of the forfeiture, has clearly held that Innovair was an innocent owner of the TLA and therefore the TLA was not subject to forfeit. This Court's opinion then directed the parties to address the taking issue.

In 2004, Plaintiff filed a Motion for Summary Judgment and the Government filed an opposition and Cross–Motion for Summary Judgment. In evaluating the cross motions for summary judgment on the matter of liability for the alleged taking of Plaintiff's property without just compensation, this Court applied the three-step analysis set forth in *Osprey Pacific Corp. v. United States*, 41 Fed.Cl. 150 (1998). First, the Court found that Plaintiff had a property interest in the TLA at the time of the seizure and maintained it until the forfeiture, holding that neither BTC's termination letter nor the settlement of the Wisconsin case[1] extinguished Innovair's property interest.[2] Second, the Court held that the Government's action constituted a *per se* taking for the purposes of the Fifth Amendment. Third, this Court addressed the issue of whether Innovair received just compensation for the taking. Construing the facts in the light most favorable to the non-movant and making all reasonable inferences in the non-movant's favor, as the standard for summary judgment requires, this Court found that Innovair had not received just compensation for the TLA in the substitute *res* bond.

On August 31, 2006, this Court Granted in part Plaintiff's Motion for Summary Judgment and denied the Government's Cross–Motion for Summary Judgment and denied as moot the Government's Motion to Dismiss. The Court found that Innovair retained its ownership in the TLA at the time of the forfeiture. Further, the Court found that the Government's actions amounted to a compensable taking. The Government argued that Innovair had received just compensation through the substitute *res* bond. The Court, noting that the District Court had already stated that the TLA had value above the substitute *res* bond, held that the issue of just compensation must be determined during the damages phase of the litigation. Thereafter, a two-week trial for damages was held in Washington D.C.

Defendant then filed a Motion for Reconsideration of the Court's liability opinion based on the Federal Circuit's decision in *AmeriSource Corp. v. United States*, 525 F.3d 1149 (2008). Defendant argued that under *AmeriSource*, when the Government seizes property pursuant to its police power, there is no taking under the Fifth Amendment. Further, Defendant argued that under *AmeriSource*, the Government may seize and retain property pursuant to its police powers irrespective of the owner's innocence. The Court denied Defendant's Motion to Dismiss, holding there was no tenable connection between the crime and that *AmeriSource* is further distinguishable from this case because the planes were not seized to be used as evidence. *Innovair Aviation Ltd. v. United States*, 83 Fed.Cl. 105 (2008).

## II. Discussion

### A. Legal Standard

 Where a taking has occurred, a plaintiff is entitled to just compensation. The fundamental principle of just compensation is reimbursement to the owner, so that he is put in as good a position pecuniarily as if his property had not been taken. *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 550 F.2d 639, 647 (1977). In most cases, courts use the fair market value of the property at the time of the taking. *United States v. Miller*, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943). This is the amount that a willing and informed buyer would pay a willing and informed seller in an arm's length transaction. *Shelden v. United*

---

1. Basler and Innovair sued each other in Wisconsin, each contesting their obligations and performance under the TLA. Ownership of the TLA was also at issue. Under the settlement, Basler retained ownership of the TLA and Innovair retained the right to bring an action against the Government for taking of the TLA.

2. This Court's full opinion is available at *Innovair Aviation, Ltd. v. United States*, 72 Fed.Cl. 415 (2006).

*States,* 7 F.3d 1022 (Fed.Cir.1993), *remanded to* 34 Fed.Cl. 355, 365 (1995) (holding that market prices are fair when the transaction is not affected by "undue stimulus"). Further, the proper measure is what the owner has lost and not what the taker has gained. *Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958, 969 (1979); *see also United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 635, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961) ("[t]he question is, What has the owner lost? not, What has the taker gained?") (citation omitted).

■ However, the Supreme Court has held that fair market value is not the only measure of just compensation. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 512, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) ("[T]his Court has refused to designate market value as the sole measure of just compensation. For there are situations where this standard is inappropriate."). This Court has said, "the law is not wedded to any particular formula or method for determining fair market value as the measure of just compensation." *Stearns Co. v. United States,* 53 Fed. Cl. 446, 458 (2002), *rev'd on other grounds,* 396 F.3d 1354 (Fed.Cir.2005). The trial court has broad discretion to determine which valuation method is most appropriate. *See Seravalli v. United States,* 845 F.2d 1571 (Fed.Cir.1988)("the law is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation")(quoting *Sill Corp. v. United States,* 343 F.2d 411, 416 (10th Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965)).

Plaintiff offered evidence at trial that the best valuation method for determining just compensation is the "lost expectancy interest value," defined as Innovair's interest in "being put in as good a position as it would have been in had the TLA not been taken." P. Post Tr. Br. at 6. Plaintiff argues that because the TLA was not a parcel of land or any other tangible property, this case is "a very unusual takings case." *Id.* Further, Plaintiff argues that the comparable sales approach is inapplicable here due to the unique value of the asset.

Defendant counters that the expectancy interest approach is actually an attempt to seek consequential damages and that such lost profit damages are not permitted. D. Post Tr. Br. at 4 (citing *United States v. General Motors,* 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). Rather, Defendant urges the Court to use the comparable sales approach, arguing that the Government and Basler's negotiation of $1.375 million in a substitute *res* bond in exchange for the TLA is a comparable sale.

This Court has already held that the substitute *res* bond negotiations are not relevant to the valuation of the TLA and that the price of the bond is not an appropriate valuation:

> Because the $1.375 million bond was to secure the Government's interest in the TLA, the Court finds that the substitute *res* bond negotiations are not relevant to the amount necessary to put Innovair "in the same financial position as if there had been no taking," *Whitney Benefits Inc. v. United States,* 18 Cl.Ct. 394, 407 (1989). Further, the negotiations over the value of the TLA for the substitute *res* bond were not arm's length transactions and, thus, not evidence of the TLA's fair market value, as the transaction was not voluntary since there was no willing seller.

*Innovair v. United States,* 82 Fed.Cl. 567 (2007). The Supreme Court has held that fair market value is the amount that "a willing and informed buyer ... *under no compulsion to buy,* will pay, and what a willing and informed seller, *under no compulsion to sell,* will accept." *United States v. Miller,* 317 U.S. at 373, 63 S.Ct. 276 (emphasis added). Here, it cannot be said that there was no compulsion to buy, as the seizure of the TLA had effectively put Innovair out of business. In addition, the Ninth Circuit noted that "[w]hat Innovair paid is not necessarily, or even particularly, a proper measure of what its rights are worth." *United States v. Basler Turbo–67 Conversion DC–3 Aircraft,* 1996 WL 88075, at *2 (9th Cir. Feb.29, 1996).

However, this Court has also held that "any award will take into account the fact that Innovair's claim is for value above the amount of the substitute *res* bond." *Inno-*

*vair v. United States,* 72 Fed.Cl. at 425. At the conclusion of the Arizona litigation, Innovair was awarded $1,375,000, the amount of the substitute *res* bond, plus prejudgment interest in the amount of $408,879.25. As Innovair has already been compensated that amount for the loss of the TLA, the $1.375 must be subtracted from the amount of just compensation determined below. However, the amount of prejudgment interest will not be subtracted from the final award. Since Plaintiff will not be receiving the $1,375,000 already realized, then it follows that interest will automatically not be awarded on that amount.

 It is clear to the Court that the TLA is a unique asset and as such, it did not have a value on the open market. The comparable sales approach, therefore, is inapplicable to this case and would not put Plaintiff in as good a position pecuniarily as had the TLA not been taken. However, the lost expectancy interest value would give Plaintiff a double award, as the cash flow analysis has not been discounted. If the Court were to adopt the expectancy interest approach, Plaintiff would recover the income the TLA would have generated for each relevant year plus interest. Without discounting each year's income to the date of the taking, the interest award would give Plaintiff a double recovery. Plaintiff's expectancy interest approach is essentially a discounted cash flow model without the discount.

The Court, therefore, will use a discounted cash flow model to determine what value the TLA held at the time it was taken. This Court has adopted a similar approach before. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 408 (1989), *on remand from* 752 F.2d 1554 (Fed.Cir.1985). In *Whitney,* the Court used the discounted cash flow model to value the property interests in a coal estate holding that the "capitalization ... of [plaintiff's] projected income stream" was "a reliable method for determining the fair market value of Whitney coal on the date of the taking." *Id.*

**B. Damages**

In determining the value of the TLA at the time of the taking several issues must be addressed. The first issue is the date of the taking, as the projected cash flow must be discounted to a particular date. Second, the Court must determine the relevant dates of the damages period. Third, the projected cash flow must be estimated. This third step must take into account the likely market for BT–67 aircraft and conversion kits, including whether the UTC Distributor Agreement obligated UTC to purchase planes.

**1. Date of the Taking**

 The Government seized the TLA on July 16, 1991. On November 14, 1991, the Government and BTC executed the stipulated substitute *res* bond (*res* bond stipulation). In that agreement the Government transferred the TLA to BTC in exchange for $1.375 million. The *res* bond stipulation delivered the TLA to BTC and "authorize[d] BTC to immediately begin to conduct, facilitate, and pursue the marketing and sales of aircraft" in Innovair's territory. *Res* Bond Stipulation ¶¶ 6, 14.

Plaintiff argues that November 14, 1991 is the date of the taking, as that was the date that "the invasion of Innovair's legal rights under the TLA began" and because the stipulation had the " 'inten[t] to affect' Innovair's property." P. Post Tr. Br. at 17, *citing Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. at 407. Plaintiff points to *Whitney,* in which this Court held that the taking occurred on the date of enactment of the federal statute (SMCRA) prohibiting surface mining without a state permit, not on the date the permit was denied. *Id; see also Shelden v. United States,* 7 F.3d 1022 (Fed.Cir.1993).

The Government contends that the taking occurred on May 21, 1992, the date that the District of Arizona approved the *res* bond stipulation. Defendant urges the Court to find May 21, 1992 as the date of the taking as "it was at this point in time that the United States failed to return the seized property." D. Post Tr. Br. at 31.

Indeed, this Court has already held:

Over Innovair's objections, the Arizona District Court reviewed the agreement and approved the substitution of the *res* bond for the TLA. The approval meant that the

TLA was turned over to BTC and, as the Ninth Circuit stated, 'Innovair's rights in the TLA were terminated at that point ... No matter how innocent it was.'

*Innovair Aviation, Ltd. v. United States,* 72 Fed.Cl. 415, 419 (2006)(citing *United States v. Basler Turbo–67 Conversion DC–3 Aircraft,* No. 94–16876, 1996 WL 88075 at \*2). In approving the res bond stipulation, the Arizona District Court, at the request of the Government, extinguished Innovair's rights in the TLA. This Court held during the liability phase of this case, "the failure to return the improperly forfeited property, not its initial forfeiture, is the gravamen of Plaintiff's case." *Id.*

Therefore, the Court finds that May 21, 1992 was the date of the taking.

### 2. Relevant Damages Period

█ Plaintiff argues that the damages period spans the date of seizure, November 14, 1991, to the end of the TLA and the Distributor agreement, June 23, 1998. The Government contends that although the taking occurred on May 21, 1992, the damages period should not begin to run until BTC and Innovair would have settled their dispute. Because Innovair would not have been able to actually manufacture kits until BTC turned over the technology, Defendant argues, the damages period should not begin to run until January 1994, when the Wisconsin District Court trial was to begin and when Innovair would presumably have had access to the technology.

It was at the moment the *res* bond stipulation that Plaintiff lost all rights in the TLA. Damages, therefore, began to accrue from that moment. The TLA had an initial ten-year term with the option for renewal and the UTC Distributor Agreement had a seven year-term, both of which expired on June 23, 1998. Plaintiff argued at trial that the TLA could have been extended based upon its own terms, but this scenario is highly unlikely considering the hostile relationship between Innovair and BTC.

The Court finds that the relevant damages period begins at the date of the taking, May 21, 1992, and ends at the expiration of the TLA and Distributor Agreement, June 23, 1998.

### 3. The Market for BT–67 Conversion Kits and Planes

The Court must determine whether there was a market for BT–67 conversion kits in order to value the TLA at the time of the taking. At trial, Plaintiff offered evidence to establish that there was a "healthy market" for the BT–67. Mr. Carmichael and Mr. Wilson testified to the research they performed into the number of planes available for conversion worldwide and the company's likely sales potential. In addition, Plaintiff offered market analyses conducted by UTC. In 1990–1991, UTC's project team commissioned an international aviation consultancy, Avmark, to prepare a country-by-country study. The Avmark study identified the number of airframes available in UTC's territory as well as the commercial and military operators of DC–3/C47s and similar aircraft.

These studies, as well as trial testimony, inform the Court's determination about the market for the BT–67. There were several different types of markets for the BT–67: commercial passenger, cargo, niche or special missions markets, and the military market. The Court will examine each market in turn.

The BT–67 was a relatively inexpensive competitor in the commercial aviation market, and could land on short, unimproved runways. Plaintiff argues that these characteristics made it an attractive airplane for Asian markets. However, though refurbished, the airplane dated back to the 1930s and was likely perceived as old and therefore of questionable safety. In addition, the cabin was unpressurized which offered a less comfortable ride to passengers and limited the altitudes in which it could fly. Baggage space was minimal and the plane sat on its tail. While the fact that the BT–67 could land on unimproved runways was a strength for rural areas, the commercial market in fact was not receptive to the converted airplane, even in Third World countries. For these reasons the Court finds it was not likely that a strong demand existed in the commercial aviation market.

In the cargo market, there were other less expensive alternatives to the BT–67. The BT–67 was not well-suited to the smaller feeder market because it required two pilots to fly while other less expensive options required only one. Further, cargo was more difficult to load on the BT–67, as it sat on its tail and therefore the cargo had to be pulled, pushed, or carried up an incline. In the general cargo market the BT–67 is relatively small and therefore unable to carry the requisite payload. The Court finds that the market for the BT–67 in terms of cargo operations was also weak.

In the military market, many foreign militaries purchase airplanes through the United States' foreign military sales program, which under the TLA would count as a BTC sale, not an Innovair sale. Still, many foreign militaries used DC–3s, and by 1990 the piston engines were quite old and difficult to repair, meaning there was at least some demand for the conversions to a new airplane with a new engine. Therefore, the Court finds there was at least some market for military sales but it was not strong.

The most likely market for BT–67 kits or planes was in the special missions or niche markets, such as for cloud-seeding, firefighting, geophysical surveys, maritime patrol, or Antarctic-type missions. This market accounts for two to five percent of the total world aviation market. Here, the BT–67's ability to land on unimproved runways made it a strong competitor. The opportunity operators had to customize the kits or planes for their special missions also made the plane attractive.

Having determined that the BT–67 had the strongest demand in the special missions market and was also viable in the military market, the Court will now turn to the question of how many sales Innovair would have made during each year of the damages period.

### 4. Likely Sales

The Government urges the Court to use hindsight to validate or invalidate the assumptions used in projecting damages. In particular, the Government asks the Court to use the number of sales BTC made in Innovair's territory to inform the sales that Innovair may have made. While the Supreme Court has held that hindsight may sometimes be useful in correcting "uncertain prophecy," *Sinclair Refining Co. v. Jenkins Petroleum P. Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 77 L.Ed. 1449 (1933), here it cannot be discounted that Mr. Carmichael and Mr. Basler brought extensive international sales experience and contacts to the table. The sales made by Basler are not necessarily the number of sales that Innovair would have made.

Still, hindsight allows the Court to examine the fact that during the relevant damages period BTC sold twelve BT–67s in Innovair's territory. At the same time, the Government points out that Innovair planned to sell kits and BTC sold completed planes, so the sales are not comparable. The Government argues that the low number of sales was not due to lack of effort or skill, but rather because buyers were not as interested in the BT–67 as both companies forecasted. Plaintiff does not disagree that customers wanted planes, not kits, and argues that its strategy was to sell kits to distributors, who in turn would deliver completed planes. The Government contends that had Innovair sold airplanes it would have sold 2–3 planes per year during the damages period, but since Innovair planned to sell kits, it would have made no sales during the relevant period.

Various reports used by BTC and Innovair estimated the sales Innovair would make. The D & T Report discussed earlier projected that 38 units would be sold by the end of 1991. However, the report was accompanied by the disclaimer that it "is limited to presenting, in the form of a projection, information that is the representation of management ... and does not include evaluation of the support for the assumptions underlying the projections." JX 68/3. The Five Year Business Plan prepared by Innovair and BTC in 1990 projected sales by Innovair of 174 units from 1990–1994. JX 67/7. The Madison Valuation, which the Basler entities commissioned on their own in 1990, projected that Innovair would complete eight sales per year under the "low" scenario; 12 sales per year under the "mid" scenario; and 17 sales per year under the "high" scenario. DX

105/35. While these reports offer different guesses for how many sales Innovair might be able to make based on their market research, they were in part used to attract partners and investors. It is not unusual for a business to be overly optimistic about its potential particularly when reports will be used for marketing purposes.

In fact, by the end of 1991, only nine BT–67s had been delivered, all of them outside of Innovair's territory. It is clear that the market was not as rosy as both companies had expected. Still, Innovair had a Distributor Agreement with UTC which contained a provision regarding purchase obligations. In the contract, executed in 1991, Innovair promised to grant UTC an exclusive distributorship of Innovair's conversion kits within the specified territories. Plaintiff argues that in return, UTC agreed to purchase five kits per year for seven years or pay net profits if UTC failed to meet the purchase requirements. While both parties agree that the UTC contract was valid and enforceable, the Government contends that Innovair would not have been able to require UTC to pay it any lost profits. Provision 5.9 of the agreement states: "Distributor agrees to meet a minimum annual sales requirement of five kits and/or converted aircraft." PX 37. Further, provision 6.7 states, in relevant part

> The minimum total annual sales requirement for conversion kits within the Territory shall be five (5) kits. If Distributor does not order the minimum sales requirement of five kits per year, and if Distributor does not pay Seller a sum equal to Seller's net profit on five kits less the number actually ordered by Distributor during such year, Seller may elect to terminate this Agreement.

*Id.* The Government argues that if UTC failed to meet the sales requirement, it could have elected to terminate the agreement while Plaintiff argues that the contract plainly states that UTC had to purchase five planes or pay the net profits Innovair would have made.

For the purposes of determining the value of the TLA at the time of the taking, the Court does not need to determine with absolute certainty whether the UTC agreement obligated the purchase of five planes per year. Rather, it is clear that both parties forecasted that five sales was a conservative requirement based on the information at hand. There is no reason to suggest that UTC would have entered into a contract that required an unreachable number of yearly sales. It is impossible to forecast whether UTC would have complied with the terms of provision 6.7 or would have breached the agreement. Such a move would most likely have led to litigation between the two companies. The contract is clear that only Innovair could terminate. Again, what is important for valuation is that UTC promised to purchase 5 kits per year or else cover Innovair's losses.

Based on the evidence presented at trial regarding the market for the BT–67, the Court finds that Innovair would have made two sales per year in either the special missions or military market. In addition, Innovair would have made 5 sales per year to UTC through the Distribution Agreement. Using these numbers, the Court will now determine the value of the TLA.

### 5. Valuation of the TLA

To calculate the value of the TLA based on the projected cash flow, the Court must look at the gross profit from the sale of all planes in one year and then subtract the gross expenses to get the net income. The Court will use the profitability figures provided by Plaintiff through Mr. Cobb's testimony. Mr. Cobb set the initial selling price as $2,025,000 per unit, based on the UTC distributor agreement. He estimated that Innovair would apply an annual 3% increase to the pricing for non-UTC customers, and that UTC and Innovair had negotiated annual price increases to offset cost inflation. Mr. Cobb also factored in a 10% commission rate, which was what BTC paid to its sales agents. Start up costs, including research and development of the technology, development of a business plan, marketing materials, and initial distribution agreements, had already been incurred prior to the start of the damages period.

Using the finding that Innovair would have made five UTC sales and two non-UTC sales

during the relevant period, the Court now turns to calculations. In the chart below, the first column represents the gross profit per unit on UTC sales and the second column represents the gross profit per unit on non-UTC sales. Multiplying these figures by the appropriate number of units (five and two respectively) provides the total gross profit for each year.

### Gross Profit Margin During Damages Period

| Year | UTC Sales Gross Profit per Unit | Non–UTC Sales Gross Profit Per Unit | Year total gross profit |
|---|---|---|---|
| 1992–1993 | $568,800 | $572,400 | $3,988,800 |
| 1993–1994 | $566,100 | $601,200 | $4,032,900 |
| 1994–1995 | $562,900 | $627,700 | $4,069,900 |
| 1995–1996 | $561,400 | $672,100 | $4,151,200 |
| 1996–1997 | $558,300 | $703,200 | $4,197,900 |
| 1997–1998 | $556,700 | $750,200 | $4,283,900 |

Using the total gross profit figures above, the Court will now determine what the projected net income is per year using Plaintiff's estimates for expenses. The Cobb report estimated the costs relating to selling, marketing, and general administration, and detailed the costs for each year, 1992 through 1998. The year by year marketing expenses are listed in the chart below.

### Net Income During Damages Period

| Year | Total Gross Profit | Expenses | Net Income |
|---|---|---|---|
| 1992–1993 | $3,988,800 | $2,072,999 | $1,916,800 |
| 1993–1994 | $4,032,900 | $2,198,000 | $1,834,900 |
| 1994–1995 | $4,069,900 | $2,342,000 | $1,727,900 |
| 1995–1996 | $4,151,200 | $2,491,000 | $1,660,200 |
| 1996–1997 | $4,197,900 | $2,606,000 | $1,591,900 |
| 1997–1998 | $4,283,900 | $2,720,000 | $1,563,900 |

The net income numbers above are the basic numbers to be used in final calculations for just compensation.

### 6. Discount Rate and Interest

As stated previously, the above figures must be discounted to the date of the taking in order to prevent a double recovery. In addition, an interest rate must be applied to make plaintiff whole.

The projected cash flow of Innovair during the period of 1992–1998, as detailed above, should be discounted to find the TLA's 1992 value. Without the discount, this award would be a lost profits award. The Court has discounted cash flows using an annually compounded rate before. *See Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 416 (1994). A 10% discount rate shall apply, compounded annually, to discount the cash flow to 1992. The Court arrives at this figure based upon a determination of the risk factors in this case, including the risk of selling. *Id.*

Once the award is determined, the interest must then be calculated. The Supreme Court has held that in takings cases where the owner did not received compensation at the time of the taking, "the owner is entitled to interest thereon sufficient to insure that he is placed in as good a position pecuniarily as he would have occupied if the payment

had coincided with the appropriation." *Kirby Forest Indus. Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Awarding interest recognizes both the time value of money and the opportunity that plaintiff has lost to earn interest on its principal. *Whitney Benefits, Inc. v. United States*, 30 Fed.Cl. 411 (1994). While the Court has sometimes followed the practice of the Court of Claims in applying a simple interest rate in Fifth Amendment takings cases, compound interest may be given if simple interest will not provide just compensation. Plaintiff bears the burden to demonstrate that simple interest will be inadequate. *Branning v. United States*, 784 F.2d 361, 364 (Fed.Cir.1986).

■ Plaintiff argues that compound interest should be awarded due to the amount of time that has lapsed since the time of the taking. This Court has awarded compound interest where there has been "a substantial time period between appropriation and compensation." *Shelden v. United States*, 34 Fed.Cl. 355, 378 (1995) (11 years between taking and judgment); *Whitney Benefits*, 30 Fed.Cl. at 415 (11 years); *Bowles v. United States*, 31 Fed.Cl. 37, 52 (9 years). Here, 16 years has elapsed since the date of the taking, far more than in any of the above cited cases. For this reason, and because the cash flow shall be discounted using a compound rate, the Court hereby AWARDS compound interest on the value of the TLA.

### III. Conclusion

Based on the foregoing reasons, the Court finds that the date of the taking is May 21, 1992 and that the damages period runs from this date to the expiration of the TLA, or June 23, 1998. Further, the Court finds that a market did exist for BT–67 kits, that for the purposes of determining damages the UTC Distributor Agreement did require UTC to purchase five kits per year. The Court finds that the net income figures in part 5 above are the correct calculations for damages before discount, minus the $1,375,000 already awarded to Plaintiff. The parties should use the figures in part 5 and a discount rate of 10% to discount to 1992 value. Further, interest shall be awarded, compounded annually.

The parties are **DIRECTED** to file within 60 days either a stipulation or separate calculations which indicate the discounted cash flow figure as well as the interest due to Plaintiff.

**It is so ORDERED.**