**WHITNEY BENEFITS, INC., and Peter Kiewit Sons' Co., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 499–83L.**

United States Claims Court.

Oct. 13, 1989.

George W. Miller, with whom was Jonathan L. Abram, of counsel, Washington, D.C., for plaintiffs.

Alfred T. Ghiorzi, with whom were Pamela S. West and Lisa Hemmer, for defendant.

## OPINION

SMITH, Chief Judge.

This inverse condemnation action was brought by Whitney Benefits, Inc. (Whitney), a Wyoming non-profit, charitable organization and Peter Kiewit Sons' Co. (PKS), a mining corporation organized under the laws of Nebraska. They contend that their property interests in a coal estate in Sheridan County, Wyoming (Whitney coal) were taken by the defendant, and they claim that Whitney's fair market value is $300 million. Defendant contends that no taking occurred because plaintiffs are unable to prove that it would have been economically feasible to mine Whitney coal, because plaintiffs' mine plan is technologically flawed, and because the plan's valuation is too speculative. For the reasons set forth below, the court enters judgment for the plaintiffs.

## FACTS

Whitney was created in 1928 from the estate of Edward A. Whitney. The major asset of Whitney is the ownership in fee of coal underlying 1,327 surface acres of the Powder River Basin in Sheridan County, Wyoming. Whitney coal is divided into two tracts known as East Whitney and West Whitney. A substantial portion of the surface land over these tracts is irrigated or subirrigated Tongue River alluvial valley floor (AVF),[1] which is significant to farming.

---

1. An AVF consists of stream-laid deposits under and surrounding a river or other waterway. These deposits are permeable and allow water from the river to subirrigate or flood irrigate the surrounding land. This, in turn, makes the fertile surface land surrounding the river ideal for ranching or farming.

In 1973, Whitney received an offer to purchase an option to lease mining rights to Whitney coal. On November 16, 1973, pursuant to Wyoming law governing non-profit corporations, a public hearing was held to consider the proposal and two other bids, including one from plaintiff PKS. PKS was the highest bidder and was awarded the option to mine Whitney coal. PKS immediately exercised its option and, on December 3, 1974, a lease was executed giving PKS the right to mine Whitney coal in exchange for advance and operating royalties.[2] The lease was amended and extended on November 10, 1979, and remains in effect. Subsequent to obtaining the lease, PKS purchased surface property overlying Whitney coal deposits to afford access to the coal. In 1977, PKS owned approximately 590 surface acres over East Whitney.

In March 1976, after conducting preliminary tests at a cost of $1 million, PKS filed a permit application with the Wyoming Department of Environmental Quality (DEQ) for a surface mine in East Whitney to produce coal from the Dietz 1 coal seam.[3] Although this application was withdrawn in August 1976 for procedural reasons, PKS expressed an intent to refile.

On August 3, 1977, the Surface Mining Control and Reclamation Act (SMCRA) was enacted to:

> assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and [to] strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy; ... [and]
>
> [to] assist the States in developing and implementing a program to achieve the purposes of this Act.

Pub.L. No. 95–87, § 102, 92 Stat. 448 (1977) (as codified at 30 U.S.C. § 1202(f), (g)

(1982)). As a means of achieving these objectives, SMCRA prohibits surface mining without a permit issued by a state's regulatory authority which, in the case of Wyoming, is the Director of Wyoming's DEQ. SMCRA establishes guidelines for the issuance of such permits:

> (b) No permit or revision application shall be approved unless the application affirmatively demonstrates and the regulatory authority finds in writing on the basis of the information set forth in the application or from information otherwise available which will be documented in the approval, and made available to the applicant, that— ...
>
> (5) the proposed surface coal mining operation, if located west of the one hundredth meridian west longitude, would—
>
> (A) not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production,....

30 U.S.C § 1260 (1982).

SMCRA has an exchange provision which allows claimants to exchange their coal property for federal coal property if they had made substantial financial and legal commitments before SMCRA's enactment. Under the exchange provision the Secretary of the Interior is

> authorized, in accordance with such regulations as the Secretary may prescribe, to enter into an agreement with that operator pursuant to which the Secretary may, notwithstanding any other provision of law, lease other Federal coal deposits to such operator in exchange for the relinquishment by such operator of his Feder-

---

**2.** Pursuant to the lease, PKS has paid Whitney $581,798.80 in advance royalties covering the period from 1974 to the time of trial. Operating royalties were set at 12.5% and were to be deducted first from the already-paid advance royalties.

**3.** East and West Whitney contain the Dietz 1A, Dietz 1B, Dietz 2, Dietz 3, Monarch, Carney, and Masters coal seams. A coal seam is a "bed or stratum of coal." *Dictionary of Mining, Mineral and Related Terms* 224 (P. Thrush ed. 1968).

al lease covering coal deposits involving such mining operations, or pursuant to section 1716 of title 43, 1976, convey to the fee holder of any such coal deposits involving such mining operations the fee title to other available Federal coal deposits in exchange for the fee title to such deposits so involving such mining operations.

30 U.S.C. § 1260(b) (1982).

Plaintiffs believed that the Whitney tracts fell within § 1260(b)(5), and were told by DEQ officials and officials of the federal government[4] that they must file a complete mining permit application and have it rejected in order to obtain the formal declaration of non-mineability required by SMCRA to qualify for the statutory exchange. Thus, in October 1978, plaintiffs jointly filed a second application with DEQ to mine the Dietz 1 seam in East Whitney. On January 15, 1979, the application was denied for procedural reasons. In their denial letter, DEQ found that a large portion of Whitney coal was located under an AVF. DEQ then indicated to the Secretary of the Interior that plaintiffs should be considered for participation in SMCRA's exchange program.

On July 1, 1981, plaintiffs submitted a request to the Secretary of the Interior for an AVF exchange and on August 13, 1981, the Secretary, through the Wyoming State Director of the BLM, stated that Whitney satisfied the statutory requirements for an exchange. Since January 1982, the parties have engaged in negotiations concerning the exchange, focusing on a federal coal tract known as Ash Creek. PKS spent $130,000.00 doing test drilling on Ash Creek during late 1983 and through 1984. In May or June of 1983, BLM proposed the Hidden Water Tract as an alternative exchange site. PKS responded that it had mined the area in the late 1940s and early 1950s, and that it was not interested in the remaining coal. Mr. Spencer S. Davis, PKS's Manager of Engineering and Estimating, was involved in the negotiations and did not "recall any specific response or

any rebuttal to [PKS's] conclusion concerning Hidden Water. From that point forward, all discussions centered on Ash Creek tract again."

On August 3, 1983, plaintiffs filed a complaint under the Tucker Act, 28 U.S.C. § 1491 (1982), and the Fifth Amendment to the United States Constitution, in this court alleging that the passage of SMCRA had deprived them of all economically viable use of their property. Plaintiffs prayed for just compensation of $300 million, the alleged value of the property on the date of SMCRA's passage, and interest from that date. On November 9, 1983, defendant moved to dismiss plaintiffs' complaint, and on February 2, 1984, in a bench ruling, the court granted defendant's motion. The court held that since SMCRA's exchange mechanism was facially a method for ascertaining and paying just compensation, no taking, and therefore no Tucker Act claim, accrued until such mechanism had failed to provide just compensation.

Plaintiffs appealed that dismissal to the Court of Appeals for the Federal Circuit on March 16, 1984. On May 14, 1984, shortly after that appeal was filed, they instituted a "citizen suit" under 30 U.S.C. § 1270 (1982) in the United States District Court for the District of Wyoming, seeking to compel an exchange. In May 1985, the district court granted plaintiffs' motion for summary judgment, finding there had been unreasonable delay by BLM in performing the exchange, and directing the Secretary of the Interior to "tender coal equal in value to plaintiffs' fee coal pursuant to the provisions of 30 U.S.C. § 1260(b)(5) on August 30, 1985." *Whitney Benefits v. Hodel*, No. C84-193-K, slip op. at 2 (D.Wyo. May 23, 1985). The Secretary filed a notice of compliance with the district court on August 21, 1985, stating that Whitney coal had no present value since BLM's Northwest Regional Evaluation Team (NRET) concluded that surface mining on the property would be uneconomical. Plaintiffs then obtained an order to compel compliance with the exchange provision by Janu-

---

4. Responsibility for management of federal land exchanges is placed with the Department of the Interior's Bureau of Land Management (BLM). 43 C.F.R. § 2200.0-4 (1985).

ary 30, 1986. The deadline, later extended to April 14, 1986, was met by the Secretary's offer, on April 9, 1986, of an exchange of the Whitney property for the Hidden Water Tract plaintiffs had already indicated they did not want.

On January 9, 1985, the United States Court of Appeals for the Federal Circuit reversed and remanded the Claims Court's dismissal. The Federal Circuit held that the mere existence of the exchange provision, a remedy available at plaintiffs' option, did not determine whether or not the statute had effected a taking. The Federal Circuit held:

> the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act, 28 U.S.C. § 1491.

*Whitney Benefits v. United States,* 752 F.2d 1554, 1560 (Fed.Cir.1985). Therefore, further proceedings were ordered based on the rule in *Skaw v. United States,* 740 F.2d 932 (Fed.Cir.1984), where the court held that summary judgment is inappropriate when there exists a genuine issue as to whether plaintiff had valid mining rights that were prohibited from being exercised by the statute in question. Trial was held in this court and judgment was deferred for the parties to file post-trial briefs and to allow the court to hear argument on those briefs. Further extensions were allowed to consider supplemental authority, including *Nollan v. California Coastal Comm.,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), and *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285, *reh'g denied,* 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986).

## DISCUSSION

If the Fifth Amendment is to have any force, courts must determine when and whether government's actions destroy the rights in property that are an essential component of ordered liberty. Just compensation under that amendment is a fundamental component of equal justice under the law. As Justice Story said:

> That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred.

*Wilkinson v. Leland,* 27 U.S. (2 Pet.) 627, 657, 7 L.Ed. 542 (1829) (*quoted in* Dorn, *Introduction: Economic Liberties and the Judiciary,* 4 Cato J. 661, 661 (1985)).

■ The right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979). Thus, where the government's acts result in the occupation of private land, courts frequently have found a taking. When an alleged taking is due to a statutory or regulatory restriction, however, the issue is more complex and, as is true in many areas of the law, is not resolved by a bright line test. Rather, in determining if a restriction actually results in a taking, the court must consider the facts and circumstances of each particular case and make an ad hoc determination in light of three factors: the economic impact of the restriction on the claimant's property; the restriction's interference with investment-backed expectations; and the character of the government's action. *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). *See also Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

If the court finds that SMCRA's enactment caused a taking of plaintiffs' property, it further must determine the date of the taking, an appropriate method of valuing plaintiffs' interests, and the legal effect, if any, of SMCRA's exchange provision. Before that becomes necessary, how-

ever, the court must begin with an analysis of the three factors described above.

### I. The Economic Impact of SMCRA on Whitney Coal

Defendant argues that plaintiffs' coal rights were valueless *ab initio* and that SMCRA's enactment could not adversely affect already worthless property. Defendant contends that plaintiffs' property was worthless because there was no market for Whitney coal and Whitney coal was not technologically mineable. This court holds, for the reasons set forth below, that there was a market for Whitney coal, that Whitney coal was mineable, and that the enactment of SMCRA had a devastating economic impact on plaintiff's property.

### A. Markets for Whitney Coal

■ The presence of a particular mineral on plaintiffs' property does not establish a market for that mineral. *Gila River Pima–Maricopa Indian Community v. United States*, 2 Cl. Ct. 12, 34 (1982). Nor, however, does the absence of an ongoing concern establish that a market does not exist. As noted in *Gila River*, "mining in unexplored areas is speculative in nature," *id.*, but it cannot be argued that undeveloped mineral sites have no market merely on the basis that they are undeveloped. The court must weigh the evidence of market conditions as of the taking date to determine whether a market for Whitney coal, with its particular quality and cost characteristics, existed. This question cannot be resolved by any simple formula or legal rule.

Plaintiffs urge that an active and rising coal market existed at SMCRA's enactment in 1977; the evidence substantiates this view. Decreased oil consumption and increased alternative energy consumption due to the oil embargo of 1973 is well-recognized. The coal market was a certain beneficiary of the embargo. The energy market share for coal increased from a low of 17% in 1973 to 24% in 1984. 4 *Boyd Plan* at 316.[5] Along with the increase in coal consumption, plaintiffs identified two major markets for Whitney coal: utility producers and specialized industrial users.

#### 1. Utility Producers

The primary use of coal is in the generation of electricity. The Boyd Plan indicates that 72% of total electrical production in the United States is fossil fuel oriented, with 76% of the fossil fuel being coal. The Boyd Plan identified the market areas for Powder River Basin coal as electric utilities west of the Mississippi and east of the Rocky Mountains. The Boyd Plan indicated that, within that market area, fossil fuels generate 70% of the total power with 73% of the fossil fuel being coal. The Boyd Plan also identified a primary market for Powder River Basin coal which includes Arkansas, Iowa, Kansas, Montana, Nebraska, Oklahoma, and Wyoming. In these states, Powder River Basin coal represents more than 50% of all coal burned. The Boyd Plan tabulated the breakdown of coal consumption according to its sources. 4 *Boyd Plan* at 362. It clearly shows a generally increasing market for Powder River Basin coal. For example, it shows that coal consumption in the primary market in which Whitney would compete increased from 12,272,000 tons in 1975 to 78,224,000 tons in 1984. Additionally, the Boyd Plan shows an increase in the total consumption of Powder River Basin coal from 44,901,000 tons in 1975 to 148,801,000 tons in 1984. 4 *Boyd Plan* at 362.

The majority of utility plants built before 1978 use cyclone boilers to produce energy and burn the same type of coal as Whitney coal.[6] Although defendant's experts pointed out that no new cyclone boilers are currently being built, there is a continuing need for cyclone-suitable coal to fuel 145 remaining cyclone boilers. These 145 cyclone boilers require approximately 20 mil-

---

**5.** The Boyd Plan was prepared for plaintiffs by the John T. Boyd Company of Denver, Colorado. It is a fair market valuation of Whitney coal based on a Discounted Cash Flow analysis. The Boyd Plan offers several different values for Whitney coal based on a series of alternate dates.

**6.** Cyclone boilers burn low ash fusion and low sodium coal.

lion tons of Whitney-type coal per year. A Whitney mine would have been in a good position to compete for coal in this 20 million tons per year market had its development not been halted by SMCRA's enactment.

As support for the ongoing demand, plaintiffs point to a contract between Northern Indiana Public Service Company and the Carbon County Coal Company. That contract for the Schahfer 14 boiler calls for 11,000 Btu/lb.[7] coal at $24.00 per ton. Plaintiffs maintain that after adjustments for Btu content and transportation differences, a comparable price for Whitney coal would be $14.00 per ton. It is the court's understanding of the coal market that many, if not all, of the contracts are interchangeable among purchasers and producers provided that basic quality and price demands are met. Because Whitney coal is close to transportation and is of high quality, it could compete for contracts in these markets.

Defendant asserts that the Boyd Plan ignored the historical market for Sheridan County coal and created an illusory market based upon demand for low-cost coal outside of the relevant area. This contention is premised on the cost dichotomy between Eastern Powder River Basin coal and Western Powder River Basin coal. Clearly, the existing mines in the Eastern Basin have a lower stripping ratio than Sheridan County mines.[8] The Big Horn mine in Sheridan County has a 5-to-1 ratio, while the average for assigned reserves of Whitney coal would be 4.38-to-1, according to the Boyd Plan.[9] Mines located in the Eastern Basin, however, have stripping ratios ranging from a low of 1-to-1 at the Bucks-

kin and Fort Union mines in Campbell County, Wyoming, to a high of 3-to-1 at the Dave Johnson mine located in Converse County, Wyoming. According to the defendant, the existing market in the 1970s and 1980s was for low stripping ratio/low cost Eastern Powder River Basin coal, rather than higher cost Western Powder River Basin coal.

Contrary to defendant's argument, plaintiffs put on evidence indicating that the higher price of Sheridan County coal is offset by its higher quality. Sheridan County coal has one thousand Btu's per pound more than Campbell County coal. Additionally, the low ash fusion temperature and low sodium content of Whitney coal makes it ideal for the cyclone boilers prevalent in midwest utilities. Plaintiffs also put on evidence of a 7 million tons per year contract between the Spring Creek Coal Mine and Houston Mining and Power Company. According to plaintiffs' expert, Mr. David J. Morris, the Houston Mining and Power contract price escalated to $19.00 per ton in 1985–86. Additionally, a mine of Whitney coal could have competed for Big Horn's contract with Commonwealth Edison. That contract was entered into in 1978 at $14.60 per ton and escalated by 1986 to over $30.00 per ton.

While the court does not agree with plaintiffs' estimate of a 3 million tons per year utility market for Whitney coal, the court is convinced that plaintiffs have proven a market for 2 million tons of utility coal destined for the cyclone boiler market. Plaintiffs' expert testimony and its market data convince the court that a substantial market existed in 1977 and will continue to

**7.** "Btu" stands for British thermal unit. One Btu is equivalent to the heat needed to raise one pound of water 1 degree Fahrenheit, or 252 calories. *Dictionary of Mining, Mineral and Related Terms* 142 (P. Thrush ed. 1968). In general, the higher the Btu, the better the grade of coal.

**8.** The stripping ratio is the ratio of tons of earth and rock lying on top of the coal seam per ton of recoverable coal. The higher the stripping ratio, the more expensive the coal is to mine. This is because more overburden (earth, rock, etc.) must be removed to obtain the coal. In

strip mining, the removal of overburden is one of the key cost elements.

**9.** Included in the Boyd Plan's calculation of this stripping ratio was the assumption that the production level would be 4 million tons per year. For reasons stated elsewhere in this opinion, the court has concluded that the production level ratio, since logically the most accessible of the Whitney coal would be mined first. The court's own calculations, based on the annual stripping ratios set forth in the Boyd Plan, estimate that the average stripping ratio at an annual production level of 2.5 million tons would be 4.14-to-1.

exist for the life of the 145 currently existing cyclone boilers.

### 2. Industrial Users

The industrial coal market requires high Btu, low sulfur coal, and specialized loading and sizing facilities at the mine. Plaintiffs argue that Whitney coal is suitable for the industrial market.[10] Plaintiffs support this contention by noting that the Spring Creek Mine, located just across the Montana border from Whitney, supplied 1 million tons per year to industry. Defendant gratuitously asserts that Whitney could not compete with Eastern Power River Basin mines or the Montana mines. The Montana mines are located within a few miles of the Whitney property and have only slightly lower stripping ratios than Whitney.[11] Defendant makes light of Spring Creek's 1 million tons per year industrial coal contract. Defendant argues that since the Spring Creek mine was not opened until 1980, a prudent buyer would not base 1977 market estimates on 1980 sales. Further, defendant asserts that Spring Creek has a competitive advantage because the land was leased from the federal government at $1.00 per acre.

The court cannot agree with defendant's arguments. Spring Creek's contract is a specific example of a potential market for Whitney coal. Whitney coal is qualitatively competitive with Spring Creek coal. Production of Whitney coal may be slightly more expensive per ton due to higher stripping ratios, but it is doubtful whether such a marginal increase in stripping ratios, and thus price, would take Whitney completely out of the market. The fact that Spring Creek was not opened until 1980 does not affect the outcome here. As the court understands it, Whitney, in the absence of SMCRA, would have become fully operational in about 1980. It would be illogical to argue that Whitney had no market in 1980 merely because Whitney was precluded by SMCRA in 1977 from beginning operations. The real point is that Whitney would have had an industrial market for its coal had it been open in 1980. The undisputed fact that Spring Creek negotiated an industrial coal contract for 1 million tons per year clearly shows that a market did exist in 1980.

While the court agrees with plaintiffs that a specialized market for Whitney coal did exist in 1977, it declines to hold that this market potential was 1 million tons per year. On the other hand, Whitney coal does have particular attributes attractive to industry. Therefore, the court finds based upon all the evidence that a market existed for 500,000 tons per year of industrial coal.

### B. Ability to Mine Whitney Coal

Defendant contends that the planned diversion of the Tongue River would not be adequate to contain the river flow, that plaintiffs made no plans to dewater the alluvium under the bed of the Tongue River, and that the only way to economically mine the property is to acquire substantial surface acreage in addition to the 590 acres already owned by PKS. In addition, defendant asserts that state regulatory restraints would preclude mining of Whitney coal and that Whitney could not function as a stand-alone mine.[12] As we explain below, defendant's contentions have little merit.

The Boyd Plan notes that, to divert the Tongue River, a concrete structure would be used to avoid raising settled solids and a flood berm would be constructed parallel to the diverted river. The berm would prevent high water from running off into the mine pit, and would prevent pit runoff from flowing directly into the river. Defendant takes issue with this plan. Nothing presented to the court showed why plaintiffs' plan was not feasible. The general evidence presented by plaintiff showed a technically workable plan. The court is

---

10. For an explanation of the various coal markets, see *infra* note 14 and accompanying text.

11. The Montana mines' stripping ratios range from 3-to-1 to 4-to-1, while Whitney's stripping ratio, as stated earlier, would average 4.38-to-1.

12. A "stand-alone" mine is one which can operate without the assistance of another nearby mine. A "captive" mine requires the facilities of a separate nearby mine to mine its coal.

of the opinion that this particular issue does not affect the mineability of Whitney coal. It is reasonable to assume that plaintiffs' engineers, with the cooperation of DEQ, could create a plan which would adequately contain the river. Plaintiffs' expert, Mr. James Bowlby, testified that it is standard operating procedure for DEQ to sit down with companies whose mine plans are rejected in order to overcome any obstacles to mining. The court finds his testimony reliable and credible.

Defendant contends that plaintiffs did not adequately plan to dewater the alluvium. Plaintiffs' expert, Mr. Richard L. Bate, testified credibly on cross-examination that water from the alluvium will eventually flow into the pit itself and be pumped out in the normal course of mining. Mr. Bate also estimated a two-year period for dewatering the alluvium and other aquifers. The court is of the opinion that dewatering an area is a normal feature of surface mining and needs no preconceived plan of action, nor did it in this case present any unusual obstacles. Plaintiffs adequately showed dealing with alluvial water as a mining cost and that it would be taken care of in normal mine operations. Their evidence showed it was not a major technical problem and took appropriate account of it in determining the mine's economic viability.

Defendant contends the acquisition of additional surface acreage would have been necessary for the operation of a Whitney mine. Plaintiffs admit this, but maintain such acquisitions are a normal part of any mine operation. The Boyd Plan allotted $1.9 million for the purchase of 2,200 surface acres on which to store overburden and over which to temporarily divert the Tongue River. Defendant maintains that the acquisition of additional surface lands was not feasible because owners of the surrounding land would be reluctant to sell or would demand exorbitant prices. Plaintiffs' experts, Messrs. Bate and Morris, both gave convincing testimony that the purchase of adjacent surface rights was commonplace in the mining industry. According to both witnesses, alternative, though not optimal, plans could be developed should additional surface acres be unavailable. Difficulty in obtaining surface areas may mean that less coal could be economically mined from Whitney, but such difficulty would not have precluded mining. In fact, plaintiffs' witnesses' testimony indicated that the only essential parcel of property would be that connecting the Whitney coal to the railroad; plaintiffs' experts said that such property traditionally is available to and acquired by mining companies. The court finds that acquisition of additional surface areas was within the realistic scope of the Boyd Plan and would not have presented a barrier to the mining of Whitney coal.

Defendant argues that plaintiffs could not have obtained a permit to mine Whitney coal. Defendant maintains that Wyoming has never permitted as lengthy a river diversion as that contemplated by the Boyd Plan, and that a reasonable purchaser would not assume the risk of such a contingency. Defendant's contention has little merit. Merely because Wyoming never has allowed such a river diversion does not mean that it would not have approved plaintiffs' planned diversion. Plaintiffs' evidence clearly shows that Wyoming frequently allows river diversions, one of which, by necessity, must be the "longest" diversion. There is nothing to suggest that Wyoming would disapprove this one.

Plaintiffs' expert, Mr. Bowlby, is a hydrologist employed by PKS, and has firsthand knowledge and experience in obtaining mine permits for PKS. Mr. Bowlby testified that after a permit is submitted, DEQ typically provides a lengthy response detailing deficiencies in the plan. Normally, the response is followed by a discussion between plan developers and DEQ. The developers then attempt to satisfy DEQ's problems with their plans. In Mr. Bowlby's experience, permit applications are not rejected outright, but are subject to a process of give and take designed to protect the state's position, and yet allow developers to proceed to cure their plan's deficiencies.

It is clear to the court that the Boyd Plan is a proposal only, rather than a rigid final

design. It includes several alternatives, with the optimal choices highlighted. Thus, if plaintiffs were forced to proceed on a course other than the optimal, their costs would go up, but mining would not be precluded.

Defendant also contends that any mine on Whitney would be a captive mine. Defendant argues that a Whitney mine could not function independently of the Big Horn mine, and therefore has no value on its own. The court does not agree. The court previously has found there to be a 2.5 million tons per year market, which is adequate to support a stand-alone mine. Evidently, defendant bases its assumption that Whitney could only operate as a captive mine on plaintiffs' proposed 1978 and 1983 mine permit plans. In those plans, PKS planned to use the nearby Big Horn mine as its base of operations for mining Whitney. As the court has stated, PKS's mine permit plans are not controlling. The court must look at plaintiffs' land from the perspective of an independent, knowledgeable, and willing buyer who would develop its own unique plan to mine the property. Although it might be more economical to mine Whitney in conjunction with the Big Horn mine, plaintiffs' expert, Mr. Bate, testified that Whitney could operate as a stand-alone mine, much as Big Horn. The court is of the opinion that Whitney, much like Big Horn (which has the same quality of coal and 2 million tons per year in contracts), could economically operate as a stand-alone mine with as little as a 2 million tons per year market for its coal. This is based on Mr. Bate's testimony, the absence of evidence to the contrary, and logical inference.

It is clear to the court that Whitney coal is economically, legally, and technologically mineable, and therefore valuable. Although the court does not agree entirely with the Boyd Plan's dollar valuation of the property, it is compelled to agree that the property has substantial value. In the valuation section of this opinion, the court will determine the actual dollar amount by which plaintiffs' property was diminished.

## II. Interference with Investment–Backed Expectations

Plaintiff PKS made a significant developmental investment in Whitney coal. PKS paid Whitney $582,798.80 in advance royalties for the right to mine Whitney coal. In addition, PKS spent at least $1.5 million for land studies of the property and the permit applications. Prior to and during development of the plaintiffs' Boyd Plan, a substantial amount of data concerning the quantity and quality of Whitney coal was assembled from test drilling 102 holes. The data from these 102 drill holes, accompanied by the actual mining experience of PKS, provided the Boyd Company with a sound picture of the actual coal on Whitney property. The information developed from the test holes indicated approximately 191,688,000 tons of in-place coal, not all of which is recoverable.[13] Recoverable coal was estimated at 143,017,000 tons. Of that amount, the Boyd Company determined that it would be optimal to mine 81,640,000 tons of assigned reserves at a value to the mine operator of $1.013 per ton, with 61,377,000 residual tons valued at $0.203 per ton. Given the extensive site testing done by PKS, its market evaluation, and cost analysis, we find that investors reasonably could expect the returns on their investments in Whitney coal that the Boyd Plan sets forth. There is no reason in fact or law why a knowledgeable investor would have considered Whitney coal a bad investment in 1977.

## III. Character of Government Action

■ A constitutional taking can be found absent a physical invasion when a government act denies the owner all "economically viable use of his land." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138,

---

13. In the process of surface mining, some in-place coal is lost as extra overburden is removed.

The Boyd Plan breaks Whitney coal down into four classes (1) *Total Coal Resources*—coal in place in the ground; (2) *Total Coal Reserves* —all mineable coal; (3) *Assigned Reserves*—the most economical coal to recover; and (4) *Residual Reserves*—mineable, but more expensive coal which usually would be mined only if coal demand increased substantially.

2141, 65 L.Ed.2d 106 (1980). In the case at hand, there was no physical invasion of plaintiffs' property, but SMCRA effectively denied plaintiffs all economically viable use of their coal property. Defendant argues that other uses for the Whitney property exist. According to defendant, SMCRA only affected one strand of plaintiffs' bundle of property rights, thereby leaving plaintiff the right to underground mine, the right to explore and mine other minerals, the right to ranch and farm, and the right to exchange Whitney coal for valuable federal coal. This court holds, for the reasons set forth below, that there are no economically viable alternative uses for plaintiffs' property.

There is little evidence to refute plaintiffs' contention that underground mining of Whitney coal is economically and technologically unfeasible. Plaintiffs' expert, Mr. Morris, testified that underground mining was not economically competitive with strip mining. Plaintiffs' other expert, Mr. Bate, testified that two serious problems would thwart any attempt to underground mine Whitney coal. First, any significant subsidence of the surface area around the river, as is likely in underground mining, would turn the AVF into a swamp. Second, faulting and the hydrologic connections between the river and underground voids would be likely to result in such a substantial amount of water entering the mine that it would be difficult, if not impossible, to remove it.

As evidence that underground mining would be feasible, defendant points out that underground mining was done in Sheridan County by the Pittston Company up until 1952. The Monarch Seam on the Hitson–Schreibeis property once was underground mined, and there had been underground mines near the Big Horn mine. Defendant's argument fails to recognize that these properties are not under AVF's and therefore are not subject to the technological problems which would make an underground mine on Whitney unfeasible. Plaintiffs have shown that underground mining is not feasible on Whitney. This property is unique because of its situation near and under the Tongue River. The court understands that underground mining would be exceedingly difficult, if not impossible, in such a situation, and the experts' credible testimony strongly supports this.

Defendant additionally contends that plaintiffs own the rights to mine minerals other than coal on their property. While it is true that plaintiffs do own mineral rights on some Whitney coal property, the record indicates that there are no such valuable minerals, nor oil and gas, on the property in question. Mr. Morris testified that all of the test drilling, except for a small gas field six miles northwest of Whitney coal, resulted in dry holes. There is no evidence in the record that plaintiffs' property at issue in this case contains any valuable resource other than the coal which they are precluded from mining. Defendant's bald assertions do nothing to persuade the court otherwise.

Defendant also contends that PKS has a valuable property right in farming and ranching the surface property. Defendant's contention is completely off the mark. Plaintiffs argue that SMCRA effected a taking of their *coal rights* to the property, not the surface rights which were bought by PKS only to facilitate mining. There is no question that Wyoming recognizes separate mineral and surface estates. *Williams v. Watt,* 668 P.2d 620, 624–25 (Wyo.1983), and that mineral rights are property subject to the Fifth Amendment's taking clause, *see Skaw,* 740 F.2d at 935–36. Because plaintiffs are claiming only that defendant took their coal rights, and not their surface rights, consideration of surface rights bought to facilitate the mining of Whitney coal as part of plaintiffs' bundle of property rights is not warranted.

## IV. A Taking under the Fifth Amendment

The precedent by which this court is bound teaches that in order to decide when a governmental action becomes a taking of property, the trial court must balance two quantities. The Supreme Court has stated that:

The determination that governmental action constitutes a taking is, in essence a determination the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken ... the question necessarily requires a weighing of private and public interest. *Agins*, 447 U.S. at 260–61, 100 S.Ct. at 2141–42 (citations omitted).

On one side of the scale is the governmental and public interest in the action in question. Historically, whenever that governmental or public interest is directed at preventing a classic nuisance, this side of the scale almost automatically decides the issue. *See, e.g., Mugler v. United States*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). When a nuisance is not involved, then the court must also look to the other side of the scale. *Florida Rock Indus. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). In that side of the balance the court must place the burden, in both absolute and relative terms, placed upon the holder of the property rights at issue. The outcome of the balancing does not relate to whether Congress may "take" the property in question. Rather, it answers the question: May Congress or the United States burden the instant property without just compensation?

This case presents a dispute where a proper government purpose, protecting agricultural land, must be balanced against the absolute diminution in value of the property at issue that the court has found. Logically, when a diminution in value is absolute, a taking is more easily found.

Defendant cites to the court such cases as *Mugler*, and *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), which expressed the view that an exercise of police power can never result in a taking. Those cases largely are limited to a narrow set of facts. This court, relying on modern Supreme Court cases, has noted that taking law has progressed much since *Mugler* and "it is no longer asserted that a regulation, by its very nature as a regulation, cannot be an exercise of eminent domain." *Florida Rock*, 791 F.2d at 900.

In the case at hand, the diminution in property value is total, and there is no public interest in causing the plaintiffs to solely bear the burden of maintaining the AVF protected by SMCRA. The court finds that SMCRA's enactment took plaintiffs' property.

## V. Date of the Taking

■ Having determined that a taking has occurred, the court must find the value for which plaintiff is to be compensated. The first inquiry necessarily involves establishing the date on which the taking took place. In this regard, "the time when economic development [is] effectually prevented [is] the date of the taking." *Whitney*, 752 F.2d at 1559. Thus, this court must determine under the facts of the present case when the economic development of Whitney coal was precluded by SMCRA.

Plaintiffs argue that defendant took their property on August 3, 1977, the date SMCRA became effective. Such a result follows, say plaintiffs, because SMCRA was clearly intended to affect the Whitney property. Although defendant publicly has admitted that the "[d]evelopment of the [Whitney] coal was halted by the passage of [SMCRA]," Notice of Realty Action, 51 Fed.Reg. 3124, 3125 (Jan. 28, 1986), defendant would have us date the taking, at the earliest, in 1983 when the DEQ officially determined that East and West Whitney were located under an AVF.

Plaintiffs argue that SMCRA from its very inception had been intended to affect Whitney coal, and an official denial of plaintiffs' permit application was a mere formality which should not prevent this court from finding a taking at the time of enactment. In support of their position, plaintiffs cite a portion of the Congressional Record at which the application of SMCRA to the Whitney property was discussed. United States Representative Teno Roncalio of Wyoming said:

Category 3 consists of mines with no state permits but which may be grandfathered under test of paragraph (3) if the Secretary [of the Interior] determines

that they have made "substantial financial and legal commitments" ... prior to January 4, 1977. This list includes the very highly controversial Whitney Benefits' mine on the Tongue River in Sheridan County in Northern Wyoming. 95th Cong., 1st Sess., 123 Cong. Rec. 12,-638 (1977). Plaintiffs assert that Representative Roncalio's statement illustrates that Congress intended SMCRA to prevent the mining of Whitney coal. SMCRA's proposed grandfather clause specifically would have let plaintiffs mine Whitney coal because their property was enumerated in the list of properties the clause was intended to cover. Unfortunately for plaintiffs, the grandfather clause was removed before the statute was enacted to prevent the mining of the enumerated properties. Since the grandfather clause was intended to cover Whitney, and since it was removed in order to prevent the mining of Whitney, this court logically must find that SMCRA was intended to affect Whitney coal.

Defendant asserts that plaintiffs' property could not have been taken until their application for a mine permit actually was denied as a result of SMCRA's prohibitions. This normally would be the case, although such application would not be required when it clearly would be futile. *Cf. Conant v. United States*, 12 Cl.Ct. 689, 692 (1987) ("it would serve no purpose to require claimant to exhaust administrative procedures before seeking judicial review when it is clear that resort to administrative action would be futile"). A *fortiori*, when a statute is enacted, at least in part, specifically to prevent the only economically viable use of a property, an official determination that the statute applies to the property in question is not necessary to find that a taking has resulted. The denial of plaintiffs' mine permit was a mere formality that will not prevent this court from finding an earlier taking date. It makes little sense for Congress to pass SMCRA with the intention that it apply to plaintiffs' property and then for defendant to require plaintiffs to obtain an official determination that SMCRA applied to their property before a taking could occur. Congressional intent as to the Whitney coal was abun-

dantly clear when it passed SMCRA. Plaintiffs' property was taken at its enactment. Defendant argues that Representative Roncalio's statement before the House of Representatives is not determinative of congressional intent that SMCRA should cover Whitney coal. While this may be the case, it is evidence that a formal administrative determination was not needed for plaintiffs taking claim to be ripe.

Finally, defendant cites several cases, including *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), *Agins*, and *Florida Rock*, as standing for the proposition that the mere enactment of a statute cannot be a taking. Notwithstanding defendant's representations to the contrary, at a minimum these cases do not diminish this court's decision that the taking occurred August 3, 1977. More directly, they support the court's present finding that the enactment of a statute *can* result in a taking when, as in the instant case, it deprives a party of all economically viable use of its land.

## VI. Valuation of Whitney Coal Estate

When private property is taken for a public purpose, the Constitution requires the taker to pay the owner "just compensation" and imposes on the court the duty of determining what compensation is just. *Almota Farmers Elevators & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The Supreme Court has determined that "just compensation" means the full monetary equivalent of the property taken. The owner is to be put in the same financial position as if there had been no taking. *United States v. Reynolds*, 397 U.S. 14, 15–16, 90 S.Ct. 803, 804–05, 25 L.Ed.2d 12 (1970); *Houser v. United States*, 12 Cl. Ct. 454 (1987). However, the value of the property taken is not the value to the owner for his particular purposes. The sovereign must pay for what it takes, not for opportunities the owner loses. *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

The fair market value of the property at the time of the taking has become the

accepted criterion for determining just compensation. *See Foster v. United States*, 2 Cl.Ct. 426 (1983). The Supreme Court has defined fair market value as:

> The amount that a willing and informed buyer of mining properties, under no compulsion to buy, will pay, and what a willing and informed owner, under no compulsion to sell, will accept for property, after fair and voluntary dealing, and taking into account all those factors which such willing and well informed persons would consider regarding the property in light of the custom of the industry.

*United States v. Miller*, 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336, *reh'g denied*, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162 (1943).

Appraisal experts employ several generally-accepted methods of valuing real estate. The traditional and most frequently-used method, the comparable sales approach, uses sales and purchases of properties that reasonably resemble the subject property with respect to time, place, and circumstances. Defendant urges the court to use this method. Plaintiffs urge the court to adopt its Boyd Plan, which employs an often-used method incorporating the discounted cash flow (DCF) approach, valuing the property based on the discounted stream of income the property is capable of producing over its useful economic life. For the following reasons, this court will use the Boyd Plan in determining the fair market value of Whitney coal.

### A. Comparable Sales

■ Defendant asserts that plaintiffs inadequately searched for comparable sales and "refused to reveal" existing comparable sales. Defendant offers no evidence to support its allegation that plaintiffs refused to reveal existing comparable sales. Moreover, defendant asserts that the sale of the Hitson–Schreibeis tract is a comparable sale by which to value the property in dispute. The defendant is in error; the Hitson–Schreibeis tract is dissimilar in site and physical circumstance to the Whitney property.

In order for a comparable sales analysis to work, the sale to which the property at hand is compared must not have been sold out of necessity or compulsion. *See Miller*, 317 U.S. at 373–74, 63 S.Ct. at 279–80. Far from being "willing but not obligated to sell," the owners of the Hitson–Schreibeis tract had little choice but to sell to Big Horn. Initially, Mr. Morris, testified that the Hitson–Schreibeis tract is a small bypass tract adjacent to Big Horn. He explained that because of the site of the tract and the physical circumstances of the property surrounding it, the Hitson–Schreibeis tract never would be mined unless Big Horn mined it, but Big Horn could just as well bypass the tract and continue mining beyond it.

In addition, a substantial amount of the coal underlying Hitson–Schreibeis has been burned or mined. Plaintiffs' expert testified that a "substantial and unmeasurable portion of the reserve had been burned out by a fire that had been raging underground for years, consuming the coal in the Monarch seam under part of the tract." He also testified that underground mining had taken place on the tract years ago, removing much of the coal; surface subsidence rendered surface mining on the remaining seams very difficult. It became apparent at trial that defendant's experts were not aware of those facts about the underlying transaction when they decided to urge Hitson–Schreibeis as a comparable sale. Therefore, on the basis of these facts adduced from the record concerning the sale of the Hitson–Schreibeis tract, we find that the transaction cannot be used as a comparable sale in evaluating the Whitney property.

### B. The Boyd Plan as a Method for Determining Fair Market Value

■ The Boyd Plan uses a DCF analysis based on the capitalization of Whitney's projected income stream to value Whitney coal. The court finds for the reasons set forth below, that the Boyd Plan offers a reliable method for determining the fair market value of Whitney coal on the date of taking.

### 1. Capitalization of Business of Profits and Speculative Damages

Defendant contends that the Boyd Plan represents an inappropriate attempt to determine the fair market value of Whitney coal based on the capitalization of business profits. It relies on *General Motors Corp.*, and argues that this DCF method is impermissible because it includes a component of value attributable to the leasehold owned by the mine operator, PKS, and represents a valuation of "lost profits." In support of this conclusion, defendant cites *Cloverport Sand & Gravel Co. v. United States*, 6 Cl. Ct. 178, 191 (1984), which states, in pertinent part:

> [T]he Court must draw a distinction between the capitalization of income generated by the property itself and income derived from a business conducted on the property. Federal courts have frequently criticized and rejected valuations based on the capitalization of profits as being uncertain and speculative. Profits derived from business activities depend to a greater extent upon the amount of capital invested and the good fortune, business skill and management with which the business is conducted than upon the land itself.

(citations omitted). Defendant asserts that the Boyd Plan compensates PKS's leasehold interest and therefore is nothing more than the mere capitalization of business profits.

█ In place of the Boyd Plan, defendant offers two royalty stream valuations which it asserts represent the value of Whitney Benefits' interest as lessor under the 1974 lease. The first is embodied in a six-page report by the NRET dated April 8, 1986. The second is contained in a three-page letter from defendant's expert, Mr. Weir, dated April 7, 1986. Both of these valuations are based on the same basic assumptions. Rather than value the Whitney coal as a fee interest of the two plaintiffs as lessor and lessee, defendant's valuations focus only on the interest held by Whitney Benefits. Thus, in both of its valuations, defendant has disregarded the leasehold interest owned by PKS and mere-

ly has analyzed the royalty income Whitney could have expected to receive under its 1974 lease had SMCRA not prohibited surface mining of the property. This is clearly a misapplication of eminent domain law. This is not a lost profits case. This case involves coal reserves, the value of which can be measured only by their ability to produce income. Simply stated, an operator's interest in a mineral estate is a compensable property interest. *Foster*, 2 Cl. Ct. 426. As the court in *Foster* explained, "the value placed on an operator's interest is not compensation for the consequential damages of lost business profits; it is compensation for the taking of an interest in real property." *Id.* at 449.

Further, defendant relies on cases in which plaintiffs sought to be compensated for decreased profits from their businesses, as well as diminution in the value of their property. In *General Motors*, 323 U.S. at 379, 65 S.Ct. at 360, for example, the Court held that:

> just compensation for the taking of property does not include the future loss of profits, the expenses of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign.

*Accord Mitchell v. United States*, 267 U.S. 341, 344–45, 45 S.Ct. 293, 293–94, 69 L.Ed. 644 (1925); *Joslin Mfg. Co. v. City of Providence*, 262 U.S. 668, 675, 43 S.Ct. 684, 688, 67 L.Ed. 1167 (1923). The case at hand involves coal reserves, the value of which can only be measured by their ability to produce income. Lost profits, on the other hand, would be compensation for value added to the property taken by the plaintiffs' location and goodwill, their management skill, and all the potential risks and opportunities that make up the concept of profit. Thus, plaintiffs do not seek lost profits as consequential damages, as did the plaintiffs in *General Motors, Joslin*, and *Mitchell*. Instead, they seek the value of their coal which is measured by the dollar amount for which they could sell it.

■ Defendant also contends that DCF methods based on capitalization of income are too speculative. Defendant points out the impossibility of determining, before actual mining, precisely how much recoverable coal a tract contains and whether it could in fact be mined profitably. Although these uncertainties are undeniable, the Supreme Court has explained that:

> Until there has been full exploiting of the vein its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet uncertain and speculative as it is, such "prospect" has a market value; and the absence of certainty is not a matter which the railroad company can take advantage, when it seeks to enforce a sale.

*Montana Ry. Co. v. Warren*, 137 U.S. 348, 352, 11 S.Ct. 96, 97, 34 L.Ed. 681 (1890).

There may be some uncertainty in any estimate of Whitney coal reserves, but that should not prevent this court from valuing plaintiffs' coal. There is a market for it and the evidence shows that a substantial amount lies beneath the surface. It certainly would undercut the protection of the Fifth Amendment if the Government could rely on the consequence of its taking a property to claim that compensation is speculative. Such an approach would turn the Fifth Amendment on its head.

Finally, it is interesting to note that the royalty stream method of valuation offered by defendant is as speculative as the DCF income capitalization method offered by plaintiffs. Moreover, defendant's expert, Dr. John Weir, testified that the royalty stream valuation method is really a subset of DCF analysis. Both the income stream and royalty stream methods require the court to adopt an estimate of the tons of coal per year that the mine will produce, the cost of mining the coal per ton, the market price of the coal per ton, and the life span of the mine. The most important difference between the two is that the royalty stream method does not take into consideration the value of PKS's leasehold, a

factor defendant asserts only would be relevant in determining lost profits, which would be improper for this court. As previously stated, the court does not agree with the defendant's characterization of this claim as one for lost profits. For reasons previously stated, the court rejects this line of reasoning, as well as the royalty stream method.

### 2. The Annual Production Rate

On the basis of an independent analysis of the 1977 coal market, the Boyd Plan concluded that a willing buyer of Whitney would have anticipated a production of 4 million tons of coal per year. Defendant's experts take issue with this conclusion, arguing that the coal market could not have supported an annual production of 4 million tons. They further argue that plaintiffs' 1977 production rate is based on the unproven assumptions that a knowledgeable purchaser of Whitney reasonably would assume that it could: secure a long term utility coal contract at $13.50 per ton for 2 million tons of coal per year; secure a market for 1 million tons of industrial coal, and sell 1 million tons of coal on the spot market. As stated earlier, this court finds that such purchaser likely could secure utility coal contracts for 2 million tons of coal per year and industrial coal contracts for an additional 500,000 tons.

### 3. The Price of Whitney Coal

■ In its Plan, the Boyd Company performed a full, independent analysis of the 1977 coal market and concluded that a willing buyer would have assumed that it could sell Whitney coal for $13.13 per ton. This result was confirmed further by the Boyd Company's review of published coal price quotations and of other actual coal sales transactions in 1977.

According to the Boyd Plan, a prudent purchaser of Whitney coal reserves would attempt to sell coal in four distinct markets: utility contract, utility spot, industrial–ROM, and industrial-sized.[14] The Boyd

---

**14.** The nature of the markets may be summarized as follows: *Utility contract:* Utility steam coal under long-term contracts. This is the an-

chor segment of production and would represent a minimum of 50 percent of the output from a projection of this type. *Utility Spot:*

Plan estimated coal prices for each of these segments in 1977 as follows:

### FIGURE 1

### COAL PRICES BY MARKET

| Market | Tons (000's) | Price $/ton |
|---|---|---|
| Utility Contract | 2,000 | $13.50 |
| Utility Spot | 1,000 | $12.00 |
| Industrial–ROM | 500 | $13.00 |
| Industrial–Sized | 500 | $14.00 |
| Average | | $13.13 |

Defendant disagrees with the Boyd Plan's price estimates and urges that a maximum price for Whitney coal in 1977 was only $10.50 per ton. Defendant's figure is based on Dr. Roy Allen's testimony that in 1977 coal from Whitney could not be sold at $13.13 per ton and could not successfully compete with coal from the Eastern Powder River Basin. Dr. Allen performed no survey and relied almost entirely on an industry publication known as *Coal Week.*[15] According to Dr. Allen, *Coal Week* showed an August 1977 price of $7.00 for Eastern Powder River Basin coal and $8.00 for Montana coal. Dr. Allen averaged these two prices, made adjustments for differences in the Btu values, and arrived at a figure of $9.00 per ton. He then added $1.50 to that figure to reflect "optimism," and concluded that the proper price a willing buyer in 1977 would have expected to receive for Whitney coal was $10.50.[16]

The *Coal Week* marker price offers a good starting point when trying to determine the price for coal; however, it should not be used alone when using a DCF method. Coal reserve quality, proximity to intended market, and proximity to transportation networks vary too widely to use *Coal Week* without a more in-depth review of the market place. Prior to April 1976, *Coal Week* combined Montana and Wyoming coal prices at $7.50 per ton for 9,500 Btu/lb. coal. Beginning in April, they were separated, with Wyoming showing $11.00 per ton for 9,300 Btu/lb. coal and Montana showing $7.75 per ton for 9,600 Btu/lb. coal. Although the heating value of Montana coal was greater, the coal quality, particularly ash fusion temperature, sodium content, and location certainly had a major impact on coal prices.

By mid–1977, as the new Gillette area mines became operational, *Coal Week* published prices for that area and for the Hanna Basin in southern Wyoming, but eliminated Sheridan County prices from its pages to protect confidential data from the single major producer in that area. In May 1977, the last month that *Coal Week* reported Sheridan County coal, the price was $12.50 per ton for 9,100 Btu/lb. coal, while the Montana price was $8.00 per ton for 9,000 Btu/lb. coal. The Montana price increased gradually until early 1980 when it stabilized at $12.00 per ton, where it remained through 1985.

Utility steam coal on a short-term or a spot sale basis. This section of the market would account for 25 percent of total output. *Industrial–ROM:* Large scale industrial users with boilers using pulverizers or modified stokers capable of using a crushed but not sized run-of-mine (ROM) coal. This would constitute 12.5 percent of the projected market. *Industrial–Sized:* Smaller-scaled industrial or institutional consumers that require a sized product for stoker use and that generally pay a higher coal price. This would constitute 12.5 percent of the projected market.

15. *Coal Week,* a weekly trade publication published by McGraw–Hill, Inc., reports regional "marker" steam coal prices on a bi-weekly basis. The prices published by *Coal Week* are meant to be representative of those within a specific coal producing region for a coal with given quality specifications. These prices are adjusted when applied to coal quality differing from the norm.

16. As developed during the cross-examination of Dr. Allen, a more thorough review of *Coal Week* prices provides substantial support for the Boyd Plan's $13.13 price. After examining the various reported prices and comparing the Btu content and location of the coal for which the magazine gave marker prices, it is the court's conclusion that Dr. Allen's estimates were too low to reflect the actual published price for Sheridan County coal. Moreover, if the $12.50 Sheridan County price is adjusted according to *Coal Week's* recommended method ($0.20 per 100 Btu) to account for the 200 Btu/lb. differential between the 9,100 Btu/lb. reported coal and Whitney's 9,300 coal, the resulting price is nearly $13.00. *See* 4 *Boyd Plan* 1–334, 335.

As a back stop to price quotations in trade journals, market transactions are the next best evidence of price. A willing buyer would have looked to the price of coal at the nearby Big Horn mine when estimating the price he could receive for Whitney coal. Plaintiffs' expert, Mr. Morris, explained that the appropriate price for Whitney coal was confirmed by sales which occurred between Big Horn and Commonwealth Edison in 1977 and their long term contract signed in 1978. Big Horn sold its coal to Commonwealth in 1977 for $14.52 per ton. In 1978, Big Horn concluded a long term contract with Commonwealth at $15.41 per ton. *4 Boyd Report* at 1–325. While the prices quoted in *Coal Week* were slightly lower than prices received by Big Horn, they confirm the Boyd Plan's view that a willing buyer would have expected to pay between $13.00 and Big Horn's $14.52 for Whitney coal. The Boyd Plan's $13.13 price is conservative when compared to the price of coal at Big Horn during the same time period, and is at the lower end of the price spectrum as established by the record. The court finds the appropriate average price for Whitney coal to be $13.13 per ton as supported by plaintiffs' evidence and expert testimony.

### 4. The Discount Rate

Plaintiffs' expert witness, Mr. Morris, explained that the Boyd Plan utilized a 10% discount rate in its analysis of the fair market value of the Whitney property. The Boyd Company discounted the cash flows derived from its cost, price, and production data to a 1977 value by applying a 10% real after-tax discount rate. Boyd based its application of a 10% discount rate on the fact that, for the purposes of evaluating coal reserves, the rate generally applied in the coal industry in 1977 fell in the range between 8% and 12%. Mr. Morris explained that coal property appraisals that applied the discounted cash flow method to undeveloped coal reserves, the professional literature, and surveys of the discount rates applied by coal producers all produced a discount rate in the 8% to 12% range. In addition, BLM's Guide to Federal Coal Property Appraisal (Appraisal Guide)

states that the Department of the Interior uses a 10% after-tax discount rate in its DCF analyses. Indeed, even the NRET previously had used a 10% discount rate to value Whitney coal for exchange purposes.

Arguing that the coal business is a high risk venture, defendant asserts that this rate does not take into account the risks involved in starting a new business from scratch. In particular, defendant argues that the 10% rate does not reflect the probability that their proposed river diversions and final impoundments would not be allowed by DEQ. Defendant argues that a discount rate of 12.5% should be used to adequately reflect risks and contingencies.

The government's own Appraisal Guide addresses several rate analysis techniques in conjunction with the DCF valuation method. The Appraisal Guide refers directly to defendant's proposed method:

> An additional technique is to incorporate a risk premium in the discount rate to account for the higher returns required by the investor to draw investment capital to riskier ventures. The increased rate frequently serves as a proxy for the potential buyer's uncertainty of future events. *In general, the use of a discount rate adjustment to account for risk is not recommended because of overwhelming subjectivity involved in selecting the risk premium.*

Appraisal Guide at 52 (emphasis supplied).

It is clear that the government previously concluded that increasing the discount rate to reflect risks and contingencies in a DCF valuation is an erroneous method and will lead to an improper valuation. On the other hand, plaintiffs' method of incorporating risks and contingencies into their DCF valuation seems reliable and accurate. In addition to a 10% discount rate, the Boyd Plan offers a sensitivity analysis which incorporates all of the risks a potential Whitney buyer would consider when making an offer to purchase the property. The sensitivity analysis takes several risk factors into consideration: Whitney was undeveloped; the proposed 4 million ton per year production rate might take several years to reach; a buyer of Whitney might not be

able to acquire additional surface land; DEQ might not approve the Boyd Plan's river diversions; DEQ might not approve the Boyd Plan's final impoundments; and the price of coal might decrease over time.

Under the Boyd Plan, a net present (1977) value of Whitney coal of $93,161,-000.00 was reduced to $82,767,000.00 after applying plaintiffs' sensitivity analysis. This represented a diminution in the 1977 value of Whitney assigned coal reserves by approximately 11%. The court finds that plaintiffs' sensitivity analysis is an accurate evaluation of the risks confronting a prospective purchaser of the Whitney property. The 11% discount reasonably reflects what a willing buyer would be likely to impose on Whitney before purchase. Because defendant's method of risk analysis, which adjusts the discount rate, has been rejected in previous government publications, and because we find the Boyd Plan's sensitivity analysis reasonable and accurate, we will adopt plaintiffs' 11% post–DCF [17] adjustment rate.

### 5. Costs

The Boyd Plan estimated both the capital and operating costs that a buyer would expect to incur during mining. The Boyd Plan's operating cost analysis first estimated the labor costs which would be incurred at a Whitney mine. With respect to hourly labor costs, the Boyd Plan relied on labor rates established by the United Mine Workers of America's contract in force at Big Horn in 1977. While a willing buyer might not plan a union operation, he would obviously expect to pay rates and provide benefits similar to those at the nearby Big Horn Mine, with which he would compete for labor. With respect to salaried labor costs, Boyd relied on rates prevalent in the coal industry in 1977, paying particular attention to the salary levels at Big Horn. The Boyd Plan estimated the costs of benefits by considering benefit levels at Big Horn and applying appropriate percentages to the wage and salary rates. 3 *Boyd Plan* at 1–150–51.

The Boyd Plan also included other operating costs in its cash flows. It analyzed supply costs on the basis of manufacturer's data, published information, and the actual cost experience at Big Horn. It also included miscellaneous direct expenses (mine development drilling, laboratory costs, etc.), general corporate expenses (legal accounting, marketing, and administrative services ordinarily performed off site), insurance expenses, property taxes, and SMCRA's reclamation fee.

The Boyd Plan's capital cost analysis considered all the capital costs that a willing buyer of Whitney would expect to incur in a mining operation. It estimated the unit prices for each item of equipment on the basis of actual quotes or purchases from 1977, where such data was available; in other cases it relied on published indices. The Boyd Plan took into account miscellaneous capital expenses. In determining cash flow, for example, it included costs for engineering and permitting work that a willing buyer would have expected to incur, given the amount of work that PKS had already done by the time SMCRA was enacted in August 1977.

██ When determining if the actual costs projected in the Boyd Plan are accurate, it is helpful to note that the government itself sets forth virtually the same type of cost analysis in its 1985 BLM Appraisal Guide. Defendant argues that this court should not look to the Appraisal Guide when determining its cost criteria for a hypothetical sale of Whitney because the Appraisal Guide was only used to value leases, not sales. Defendant's contention cannot be taken seriously. The Appraisal Guide itself states that it can be used to value federal coal property "to be disposed of through leases, exchanges, or other methods." Appraisal Guide at 1 n. 1.

The Appraisal Guide states that an appraiser using the DCF valuation methods

---

**17.** It must be stressed that the DCF figures include a discount of 10%, reflecting the after-tax real rate of return. The reduction of the value of Whitney coal by 11% that is supported by The Boyd Plan's sensitivity analysis is applied to the value discounted by the 10% after-tax real rate of return.

should estimate both capital and operating costs. As capital costs, the appraiser must estimate pre-mining studies, site preparation and surface facilities, mine equipment, pre-production development costs, working capital, and indirect, administrative, and contingency items. Appraisal Guide at 43–46. As operating costs, the appraiser must estimate labor, equipment and supplies, utilities, payroll, overhead, contingencies, and other costs. Appraisal Guide at 47.

The court is satisfied that the Boyd Plan's detailed analysis of costs includes the factors suggested by the BLM, and is accurate. The court thus agrees with the plaintiffs that a willing and knowledgeable purchaser of Whitney coal in 1977 would have contemplated $68,132,000.00 in capital expenditures and $3.747 per ton in operating costs for a 4 million tons per year mine.

Because the operating costs are primarily composed of production-related items such as overburden stripping and coal loading, it is reasonable to expect that if the annual production level is reduced to 2.5 million tons, the total operating cost would decrease proportionately, or to 62.5% of the operating costs of a 4 million ton per year mine.

Unlike the operating costs, however, capital costs will not drop in proportion to the decrease in production level from 4 million tons per year to 2.5 million. Rather, some capital costs will change while others will remain fixed. Plaintiffs have provided a reliable estimate of which capital costs will vary. Figure 2 below represents these variables and also calculates the total capital expenditures.

## FIGURE 2

### ADJUSTMENTS OF INDIVIDUAL CAPITAL COSTS

| COST | Cost $ 4 Mtpy $-000 | 4-TO-2.5 Adjustment Factor | Adj Cost @ 2.5 Mtpy $-000 |
|---|---|---|---|
| Mine Facilities & Site Dev't | 478 | 1 | 478 |
| Drainage & Diversions | 1532 | 1 | 1532 |
| Overburden Preparation | 1122 | .625 | 701 |
| Overburden Stripping | 25911 | .625 | 16194 |
| Coal Loading | 3981 | .625 | 2488 |
| Coal Haulage —Equipment | 7369 | .625 | 4606 |
| —Roads | 2442 | 1 | 2442 |
| Reclamation | 3169 | .625 | 1981 |
| Power Distribution | 539 | 1 | 539 |
| Coal Handling Facilities | 7877 | 1 | 7877 |
| Mine Service Buildings & Equipment | 4272 | 1 | 4272 |
| General Purpose Equipment | 2929 | 1 | 2929 |
| Miscellaneous | 6511 | 1 | 6511 |
| Total | 68132 | | 52550 |

Thus, the Boyd Plan, adjusted for a 2.5 million ton per year production level, substantiates capital costs of $52,550,000.00, or a reduction from the 4 million ton per year level of 23 percent.

Due to a number of factors including defendant's failure to offer an estimate of specific costs, the government's consistent use of the BLM Appraisal Guide to value

coal property, the Appraisal Guide's use of essentially the same cost criteria as the Boyd Plan, and the Boyd Plan's detailed and persuasive cost analysis, this court will use the Boyd Plan data, as modified above, in its cost estimates.

■ The main cost issue before the court is defendant's contention that the Boyd Plan substantially underestimated

reclamation costs. Defendant argues that the Boyd Plan does not allow enough floor space in the pit for mining operations and that backfilling the rear of the pit while mining its front is not a realistic expectation. Defendant's expert, Mr. Kenneth Nation, testified that a substantial portion of the pit's backfill will have to be deposited in spoil piles and later returned to the pits after mining has ceased. This would involve handling the overburden and innerburden of the pits twice which would dramatically increase costs and make the mine unprofitable and its coal valueless.

In a related argument, defendant argues that the Wyoming DEQ would not allow the final impoundments and spoil piles over third party coal that the Boyd Plan projects. Defendant contends that DEQ would require plaintiffs to backfill the impoundments completely.

The court believes that both of defendant's contentions on this point are credible. It is of the opinion that a buyer of Whitney coal would believe it likely that it would be required to backfill the entire final impoundments. Therefore, plaintiffs' recovery should be reduced by the amount it would take to backfill both the East and West Whitney pits.

In their post-trial brief, plaintiffs presented a logical analysis of the 1977 value of the cost of entirely backfilling the impoundments at the end of mine production. In essence, plaintiffs' analysis calculated the 1977 amount that a willing buyer of Whitney would have to expend in 1977 to have the reclamation completed some twenty years in the future. Plaintiffs calculated that amount to be between $1 million and $2 million. The court believes that a prudent buyer of Whitney, if he expected to totally backfill his impoundments, would have allowed $2 million in costs to cover that future expenditure. Plaintiffs' expert, Mr. Bate, on cross-examination and on redirect testified that this is a common practice in the coal industry and we find his testimony reliable and accurate. As a result, $2 million will be deducted from the amount awarded to plaintiffs for the value of the assigned reserves.

### 6. Calculations

In its calculation section, the Boyd Plan incorporates the same discount rate, unit cost per ton, cost estimates, and sensitivity adjustments that this court has found accurate and reliable. This court will adopt the Boyd Plan's calculations with an adjustment to reflect a 2.5 million tons per year production level as opposed to the Boyd Plan's 4 million tons per year level.

#### a. Assigned Reserves

The Boyd Plan sets forth a detailed table of calculations used to derive the fair market value of the assigned reserves of Whitney coal in 1977. A summary of these calculations, adjusted for a mine with an annual production rate of 2.5 million tons, is presented in the appendix to this opinion. In keeping with the court's determination that the production would have been 62.5% of that estimated in the Boyd Plan, and for reasons set forth above, these calculations include a 37.5% reduction in the after-tax income and operating costs and a 23% reduction in capital costs.

The calculations result in a net present (1977) value of $52,755,000.00 for the assigned reserves of Whitney coal. For reasons stated previously, the value of the assigned reserves must be reduced by the cost of fully backfilling the pits at the completion of mining. Accordingly, the court will deduct the $2 million backfill cost from the above value of the assigned reserves, for a net of $50,755,000.00. Finally, that figure must be adjusted to take into account the Boyd Plan's sensitivity analysis. Applying that reduction to the net value of the assigned reserves after backfilling ($50,755,000) indicates a value of $45,172,000, or $0.844 per ton.

#### b. Residual Reserves

Although we have decreased the production level of the Boyd Plan from 4 million tons per year to 2.5 million tons per year, this decrease in assigned reserves increases the amount of residual reserves that are to be left in the ground under the Boyd Plan. Accordingly, the residual reserves would equal the difference between the total number of technologically-recoverable

tons (143,017,000) and the number of tons of assigned reserves (53,526,000), or 89,-441,000 tons. The court is satisfied with the Boyd Plan's estimate that residual reserves have a value equal to 20% of the per ton value assigned reserves; therefore, the residual reserves are valued at $0.169 per ton, for a total value of $15,124,000.00.

### c. Sum

From the foregoing, the court finds that the total value of recoverable Whitney coal, assuming an annual production level of 2.5 million tons of assigned reserves and a cost of backfilling of $2 million, is $60,296,-000.00.

### 7. Interest

■ The Supreme Court has held that where the government pays just compensation after the date of taking, the property owner is entitled to interest on the award to ensure that he is placed in the same economic position as he would have occupied if the payment had coincided with the taking. *See Kirby Forest Indus. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

Defendant objects to this court awarding plaintiffs interest and maintains that paying interest on any award is unjustified where the property owner had no reasonable expectation of earning income from the property. Defendant's contention collapses upon itself with our prior determination that the Whitney coal has value and that a willing and knowledgeable buyer justifiably would expect to earn a substantial income from the Whitney coal. This court has been authorized by Congress to award pre-judgment interest on a claim against the United States if a specific congressional act so provides or if the plaintiffs' claims were based on contract. 28 U.S.C. § 2516(a).

Plaintiffs' claims are not based on contract nor is there a specific congressional act allowing interest in this situation, but the Supreme Court has recognized an exception to 28 U.S.C. § 2516(a) where the claim against the United States is based on the Fifth Amendment. *United States v. Alcea Band of Tillamooks*, 341 U.S. 48, 49, 71 S.Ct. 552, 556, 95 L.Ed. 738 (1951); *Sea-*

board *Air Line R. Co. v. United States*, 261 U.S. 299, 306, 43 S.Ct. 354, 356, 67 L.Ed. 664 (1923).

As a result of this exception, an award of just compensation under the Fifth Amendment entitles a property owner to interest from the date of the taking to the date of the payment of the judgment. *See United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1947); *Miller v. United States*, 223 Ct.Cl. 352, 620 F.2d 812, 837 (1980).

It has been the practice of this court to award interest on taking claims based on the computation set forth in the Contracts Disputes Act, 41 U.S.C. § 601–613 (1982). *Henry v. United States*, 8 Cl.Ct. 389, 394 (1985). The Act requires interest on contract claims to be paid at the rate established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41 (85 Stat. 97). *Id.* This method has congressional approval and is the most uniform method of awarding interest in claims against the United States. As a result, the rates formulated under the method prescribed by the Contract Disputes Act are the appropriate measure for calculating interest in a taking claim. *See Jones v. United States*, 3 Cl.Ct. 4, 7 (1983). Plaintiffs, therefore, are entitled to pre-judgment interest on $60,296,000.00, to be calculated according to the Contract Disputes Act.

### VII. The Exchange Provision

The Court of Appeals for the Federal Circuit has ruled, at least peripherally, on SMCRA's exchange provision. *Whitney*, 752 F.2d 1554. In that proceeding, the Federal Circuit held that the exchange is optional with the landowner, rather than a mandatory means of paying just compensation. In so holding, the court concluded:

Actually the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants, who may reject any exchange and pursue a money award under the Tucker Act. 28 U.S.C. § 1491.

*Whitney*, 752 F.2d at 1560.

It is clear from *Whitney* that plaintiffs have the option to either pursue the ex-

change or to pursue a money remedy. The two courses of action are, at least to some extent, mutually exclusive.[18] A money award in the Claims Court should and will preclude any mandatory coal exchange pursuant to SMCRA. This, of course, does not preclude the parties from voluntarily concluding a deal, outside of SMCRA's exchange program where coal is used to offset money damages.

## CONCLUSION

The Surface Mining Control and Reclamation Act reflected Congress's attempt at balancing the country's need for coal and the protection of agricultural resources and the environment. While it is not the role of this court to question the wisdom of that balancing or the manner in which Congress sought to achieve an equilibrium, this court must ensure that the Fifth Amendment's mandate that no "private property be taken for public use, without just compensation" is not ignored. In doing so, this court looks to the precedent laid out by the Supreme Court and our court of appeals. It applies this precedent to the fact specific questions of whether the instant balance struck by Congress amounted to a taking in this case and if so what compensation is just. It is clear to the court that to characterize the regulatory scheme here as "mere regulation" would virtually eliminate from the law regulatory takings. This would fly in the face of precedent this court is bound to follow.

After considering the extensive expert testimony and documentary evidence presented in this well-litigated case, this court finds that the economic impact of SMCRA on Whitney coal was to totally eliminate economic value, that plaintiffs' investment-backed expectations were reasonable, and that government action has deprived plaintiffs of all economically viable uses for their property. In holding that a taking has occurred, the court finds that the substantial public interest at stake does not outweigh the private interest such that plaintiffs should bear the full burden imposed by the government action.

It is this court's further decision that the taking took place upon the enactment of SMCRA. It is clear from the record that Congress acknowledged prior to enacting SMCRA that Whitney coal was situated in or on an AVF. Thus, it would be unreasonable under the particular facts of this case to hold that a taking could not have occurred until a subsequent administrative determination was made that mining of Whitney coal was prohibited.

For the foregoing reasons, this court finds that plaintiffs are entitled to $60,296,000.00 plus pre-judgment interest from August 3, 1977, the date SMCRA was enacted. Further, plaintiffs are entitled to attorneys fees and costs pursuant to 42 U.S.C. § 4654(c) (1982).

IT IS SO ORDERED.

## APPENDIX

### DISCOUNTED CASH FLOW—NET PRESENT VALUE CALCULATION

| YEAR | ASSN'D TONS 000 | GROSS CF @ 2.5 MTPY $-000 | CAPITAL EXP. @ 2.5 MTPY $-000 | NET CF @ 2.5 MTPY $-000 | DISCOUNT FACTOR | NET PRESENT VALUE @ 0% $-000 |
|---|---|---|---|---|---|---|
| -4 | 313 | 0 | 829 | -829 | 0.909 | -754 |
| -3 | 813 | 1273 | 9312 | -8039 | 0.826 | -6640 |
| -2 | 1875 | 4486 | 15244 | -10758 | 0.751 | -8079 |
| -1 | 2500 | 9337 | 3647 | 5690 | 0.683 | 3886 |
| 1 | 2500 | 12756 | 812 | 11944 | 0.621 | 7417 |
| 2 | 2500 | 12688 | 32 | 12656 | 0.564 | 7138 |
| 3 | 2500 | 12700 | 401 | 12299 | 0.513 | 6309 |
| 4 | 2500 | 12239 | 2499 | 9740 | 0.467 | 4549 |
| 5 | 2500 | 12207 | 1573 | 10634 | 0.424 | 4509 |
| 6 | 2500 | 12157 | 2033 | 10124 | 0.386 | 3908 |

18. The exchange provision does allow the government to pay up to 25% of the value of an exchanged property in cash, with the remaining 75% to be paid for by the land exchange itself.

418

| YEAR | ASSN'D TONS 000 | GROSS CF @ 2.5 MTPY $–000 | CAPITAL EXP. @ 2.5 MTPY $–000 | NET CF @ 2.5 MTPY $–000 | DISCOUNT FACTOR | NET PRESENT VALUE @ 0% $–000 |
|---|---|---|---|---|---|---|
| 7 | 2500 | 12342 | 1816 | 10526 | 0.350 | 3684 |
| 8 | 2500 | 12284 | 319 | 11965 | 0.319 | 3817 |
| 9 | 2500 | 12451 | 732 | 11719 | 0.290 | 3399 |
| 10 | 2500 | 12351 | 1364 | 10987 | 0.263 | 2890 |
| 11 | 2500 | 12406 | 3156 | 9250 | 0.239 | 2211 |
| 12 | 2500 | 12245 | 1461 | 10784 | 0.218 | 2351 |
| 13 | 2500 | 12316 | 1488 | 10828 | 0.198 | 2144 |
| 14 | 2500 | 12319 | 1141 | 11178 | 0.180 | 2012 |
| 15 | 2500 | 12263 | 654 | 11609 | 0.164 | 1904 |
| 16 | 2500 | 12047 | 1111 | 10936 | 0.149 | 1629 |
| 17 | 2500 | 11977 | 356 | 11621 | 0.135 | 1569 |
| 18 | 2500 | 11946 | 223 | 11723 | 0.123 | 1442 |
| 19 | 2500 | 11789 | 9 | 11780 | 0.112 | 1319 |
| 20 | 525 | 3634 | 2250 | 1384 | 0.102 | 141 |
| Totals | 53526 | | | 199751 | | 52755 |